PRICE, Judge.
Shreveport Production Credit Association has appealed from the judgment rejecting its demands against The Bank of Commerce for recovery of the sum of $31,894.14, together with interest and attorney fees. Plaintiff was the payee of a check in this amount drawn by Dr. W. L. Ryder, on his checking account with the defendant bank. The check was issued by Ryder to remit the proceeds to plaintiff of a sale of cattle on which plaintiff had a chattel mortgage. On the same date (March 31, 1978) that the defendant bank received Ryder’s deposit of several checks of the Mansfield Livestock Auction Company, drawn on a Mansfield bank, totalling $31,894.14, Ryder’s check to plaintiff in the amount of $31,894.14 was presented to it for payment through regular banking channels.
*863 Payment of plaintiff’s cheek was refused for the reason that it was drawn on uncollected funds. On the next banking day, April 3, 1978, defendant notified the Federal Reserve Bank in Dallas by telephone of the check’s dishonor and reason therefor and returned the check through the Federal Reserve System. On April 4, 1978, defendant completed collection of the several checks from the Mansfield Bank and Ryder’s account balance then exceeded $34,-000.00. On this same date notice of the dishonor of plaintiff’s check was given by telephone by the Federal Reserve Bank in Dallas to the First National Bank of Shreveport and the regional check processing center that presented the check for payment for Louisiana Bank and Trust Company, plaintiff’s depository bank. The actual return of the dishonored check to Louisiana Bank was not completed until April 10. On this date (April 10) defendant debited Ryder’s account for the sum of $26,-088.76 to pay the balance of principal and interest past due on a note owned by defendant on which Ryder was an endorser. Also on this same date a Louisiana Bank official called defendant to request a markup against Ryder’s account to expedite payment of plaintiff’s check which had just been returned. This request was denied and the reason given to the person making the request was that there was insufficient funds in the account for payment of the check. Plaintiff learned two days later on April 12 through further inquiries that the account had become insufficient for payment of its check because of the defendant’s action in exercising its alleged right of offset against the funds in the Ryder account which were for the most part generated from the proceeds of the cattle auction checks.
Plaintiff then filed this suit against defendant alleging numerous theories of recovery for the amount of Ryder’s check.
We find the principal basis on which it seeks recovery is as follows:
(1)That the defendant bank’s offset of the Ryder account was illegal because Ryder had not given express authority to the bank to exercise such a right of offset.
(2) That the offset was also improper because the defendant bank had agreed, in December 1977, to give Ryder, who was in serious financial difficulty, a one-year moratorium to work out his financial problems.
(3) That defendant bank’s officers and employees were or should have been aware of plaintiff’s interest in the disputed funds and that plaintiff is entitled to recover these funds under a “trust fund” theory.
(4) That defendant bank is liable either in tort or by estoppel because of the actions of its officers and employees in selecting a method of returning the dishonored check which resulted in undue delay and in giving misleading information which was the cause of plaintiff not having payment stopped on the checks for the cattle sales which were deposited by Ryder or to have the Ryder check re-presented for payment prior to the offset against his account.
We shall discuss these issues in the order as presented above.
(1) VALIDITY OF THE OFFSET
The indebtedness for which the defendant bank exercised its alleged right of offset against the Ryder account arises from the endorsement by Ryder of a promissory note of First Medical Investors, Inc., dated September 20, 1976, for $25,000.00, which was secured by chattel mortgage. Ryder executed the note and mortgage on behalf of the corporation as its president. He also endorsed the note in his personal capacity. The note did not contain a provision authorizing the right of offset by the bank of the maker’s and endorser’s accounts for non-payment. The mortgage identified with the note did contain the proper authorization for offset. Plaintiff contends the offset was therefore not expressly authorized by Ryder as he did not sign the chattel mortgage personally but only as president of the corporation. While there is some *864 confusion in the jurisprudence on this question, we do not find it necessary under the circumstances presented to address this issue. Whether the offset was properly authorized is an issue between the bank and its depositor. Ryder is not a party to this action and plaintiff has no standing to raise this issue on behalf of Ryder in this suit. The cases cited by plaintiff in brief on this issue are all concerned with actions brought by depositors directly against banks and are therefore inapplicable to this situation.
(2) WAS A MORATORIUM AGREED TO BY DEFENDANT
The trial court, although it gave no written reasons for judgment, dictated several findings of fact into the record at the conclusion of trial. The court found that the defendant bank had never given a firm commitment to a moratorium proposal. Plaintiff contends such an agreement was made at a meeting of a representative of the American Bank and Trust Company, Ryder, and J. Harper Cox, president of the defendant bank, in December 1977. American was the principal creditor of Ryder and was most interested in helping Ryder work out his problems. A former officer of American testified that he was under the impression that Cox agreed to such a plan if the other banks were also willing. Cox admits a discussion took place, and that he gave it some consideration. However, he denies that any firm commitment was ever made to Ryder. This version is substantially corroborated by the testimony of Ryder himself who admits Cox stated “let’s take it further and formalize it more.” We find the preponderance of the evidence to support the trial court’s finding that no agreement for a moratorium was made by defendant.
(3) LIABILITY UNDER “TRUST FUND” THEORY
Plaintiff contends that the defendant bank was aware or should have known under the circumstances that the $31,894.14 sum deposited by Ryder on March 31 was derived from the sale of mortgaged cattle, and that plaintiff had a beneficial interest in this deposit. Plaintiff stresses that officers of the defendant bank knew of Ryder’s deposit of a substantial sum from checks issued by a livestock auction company and of plaintiff’s presentment of a check in the same amount on the same date. As defendant had previously been furnished a financial statement by Ryder two years earlier showing a chattel mortgage indebtedness to plaintiff, and as defendant knew plaintiff regularly provided financing for agricultural products, plaintiff argues that defendant should have been on notice that the check was issued to it by Ryder for credit against a mortgage indebtedness.
In support of this theory of recovery, plaintiff relies principally on the decision of the Supreme Court in Merchant’s & Farmers’ Bank & Trust Co. v. Hammond Motors Co., Inc., et al, 164 La. 57, 113 So. 763 (1927). In that case the bank attempted to exercise a right of offset for notes owed by Hammond Motors against an account which was created by an attorney for the special purpose of paying certain creditors from the proceeds of a sale of Hammond Motors’ assets. The account was opened as “Hammond Motors, Escrow” which the court found placed the bank on notice of its special purpose, and the bank was therefore precluded from offsetting against the account under these circumstances. The court pivoted its decision on the fact that “the deposit formed no part of the general checking account of Hammond Motors Company, but partook of the nature of a trust fund .... ”
Plaintiff also cites and relies on the Federal District Court case of Swift & Co. v. Hammond Farmers’ Ass’n. Ltd., et al, 22 F.2d 166 (5 Cir. 1927), in which the court denied the bank the right to exercise an offset against funds collected by agents for fertilizer companies. The funds in question clearly belonged to the principals and were placed in the agents’ general accounts. The court found the evidence too conflicting to determine whether the bank had knowledge or notice of the true ownership, but decided the case on a finding that the banks had not *865 in any way changed their position or acted to their detriment because of the deposit of the special funds in the general account of the agents.
There are several distinguishing factors of the instant situation from the above cited cases. The funds Ryder received from the cattle auction and deposited in his general account with defendant bank were his funds and not the funds belonging to a third party. The evidence shows that Ryder had an understanding with plaintiff that he could sell whatever cattle he desired at any place or time, with the agreement that he would pay the full amount received against his chattel mortgage indebtedness on the cattle.[1] He was therefore not acting as an agent for plaintiff or in a fiduciary capacity. Furthermore, the checks issued by the livestock auction company contained the following endorsement: “This check issued to the payee for livestock, and by the endorsing same, the payee guarantees he is the sole and unconditional owner of such livestock and there are no liens and/or chattel mortgages on same.”
This endorsement, which was on the checks deposited in Ryder’s regular checking account, renders it difficult to cast the defendant bank officials with actual or constructive knowledge that plaintiff had a beneficial interest in these funds.
It should be noted that plaintiff took no precautions which obviously were available, to protect its interest in the sale proceeds. Instead it gave Ryder an unrestricted right to sell the cattle and to remit the sum for which the cattle were sold through his general checking account.
We can find no authority to hold that the defendant bank was under a duty to have made further investigation into the source of the funds deposited by Ryder to determine if the funds belonged to a third party or whether he intended to have such funds deposited for a special purpose under the circumstances presented. We do not find plaintiff had shown it is entitled to recover under the “trust fund” theory in this instance.
(4) LIABILITY OF DEFENDANT FOR ALLEGEDLY CAUSING DELAY IN RE-PRESENTMENT OF CHECK
Plaintiff contends primarily that defendant, for reasons it has not satisfactorily explained, routed the dishonored check bank back through the Federal Reserve Bank of Dallas, knowing that this method would result in a much longer delay for plaintiff to have access to the check for re-presentment. Plaintiff contends the more reasonable method of returning the check, since all banks involved were local, would have been to return the check directly to the depository bank of plaintiff.
We find defendant did present evidence to satisfactorily explain that it followed an approved procedure in returning the check through the Federal Reserve. The testimony of a Federal Reserve official shows that defendant followed the recommended federal reserve procedure for returning a dishonored check of this amount. Other testimony shows that should defendant have sent the check back directly to the depository bank, and that bank had insisted it be sent through normal channels, then defendant would have held the check more than 24 hours, and under banking regulations, would be solely responsible for its validity.
The testimony also shows the defendant bank did not have a correspondent relationship for clearing house purposes with the First National Bank of Shreveport, and therefore it could not have routed the check back through the same channel that it followed for original presentment.
Whatever may have been defendant’s motive or intent in routing the check through the Federal Reserve, it apparently was in accord with approved banking regulations and no further duty can be owed plaintiff in this regard.
*866 Plaintiff also contends the officials or employees of the defendant bank gave misleading or erroneous information in response to various inquiries on the status of the Ryder check which lulled plaintiff and its depository bank into a false sense of security concerning payment of the check on re-presentment, and that defendant should now be estopped from retaining the disputed funds under its alleged right of offset. Plaintiff also claims these same actions by defendant’s employees constitute tortious conduct for which defendant should be liable for its damages.
Plaintiff’s basic position is that had accurate information been received to the series of inquires made on its behalf regarding the payment of the check, it would have taken immediate steps to either request the Mansfield Auction Company to stop payment on its checks to Ryder and to reissue the checks directly to it, or it would have requested Ryder to issue another check which could have been presented for payment pri- or to defendant’s offset of the account on April 10.
The misleading information contended by plaintiff was allegedly given in response to inquiries made by Ryder’s secretary, who handled his banking affairs, and by personnel of plaintiff’s bank, Louisiana Bank and Trust Company, on April 4 and April 7. According to the testimony of these several persons, an employee of the bookkeeping department and a branch manager of the defendant bank gave erroneous or misleading information on these dates as to the status of the Ryder account. The thrust of plaintiff’s argument in this regard is that there was an inference in the responses made to the inquiries that the checks making up the $31,894.14 deposit by Ryder continued in the “uncollected funds” status throughout this period of time although they’were actually collected on April 4.
Admittedly there is some contradiction and confusion in the responses alleged to have been made by defendant’s employees. However, there is not sufficient evidence to show that any one of defendant’s employees deliberately gave any misleading or untrue information which was intended for the purpose of causing damage to plaintiff.
We do not find the evidence sufficient to sustain plaintiff’s plea of estoppel or its claim for damages in tort.
For the foregoing reasons, the judgment appealed is affirmed. Costs of this appeal are assessed to appellant.

. John D. Holliman and Robert McArthur, both assistant vice presidents of credit for Shreveport Production Credit Association in 1978, attested to this in deposition.