405 So.2d 842 (1981)
SHREVEPORT PRODUCTION CREDIT ASSOCIATION
v.
BANK OF COMMERCE.
No. 81-C-0702.
Supreme Court of Louisiana.
October 9, 1981.
Rehearing Denied November 16, 1981.
*843 Roland J. Achee of Nelson & Achee, Ltd., Shreveport, for plaintiff-applicant.
Russell O. Brabham of Schober, Clawson & Brabham, Shreveport, for defendant-respondent.
BLANCHE, Justice.
Plaintiff, Northwest Production Credit Association[1], seeks to recover the sum of $31,894.14 from the defendant, Bank of Commerce, the drawee on a check issued by Dr. William Ryder.
Ryder, a Shreveport physician and sole stockholder of First Medical Investors, Inc., had been engaged in several other business enterprises in the years preceding this lawsuit, including such interests as real estate, the movie industry, and the raising of cattle. His venture into cattle-raising commenced in 1972 and continued until 1978 when he was required to sell his entire herd in a desperate attempt to halt his deteriorating financial condition. Ryder's personal debts and those of First Medical Investors, Inc. totalled approximately $500,000 to major creditors, which included both the Credit Association and the defendant bank.
Shreveport Production Credit Association was first approached by Dr. Ryder for a livestock loan in 1973 to enable Ryder to purchase additional cattle. During subsequent years, several loans were made, each of which was evidenced by a note and secured by a chattel mortgage over Ryder's entire herd of cattle. These secured loans were renewed several times with the final renewal executed on August 27, 1976 wherein Dr. Ryder signed an agreement providing that the loan renewal was subject to the condition that all proceeds from the sale of the cattle were to be applied to the cattle loan with the Association. On this date, Ryder also executed a note in the principal amount of $68,069 due on September 1, 1977. This note was not paid when it matured and in January 1978, Dr. Ryder met with John Holliman, a representative of the Credit Association, to outline a plan for the liquidation of this indebtedness. Though it appears that some other creditors may have agreed to a moratorium to insure repayment by Dr. Ryder, the Credit Association required Ryder to sell his herd of cattle and other encumbered equipment, the proceeds of which were to be applied to the balance due on his loan.
On Friday, March 24, 1978, the cattle were sold through the Mansfield Livestock Auction Company in Mansfield, Louisiana for the sum of $31,894.14, represented by 16 *844 separate checks drawn on the First National Bank, which was located in Mansfield. The checks named Dr. William Lewis Ryder as payee and were received by him through the mail. Four days later, March 28, 1978, Ryder, Holliman and Robert McArthur, who was then Vice President of Credit for plaintiff, met and confirmed their prior agreement that the entire proceeds were to be applied to the debt owed to the Association.
The next day, March 29, Dr. Ryder's secretary, Mrs. McBride, mailed the 16 checks representing the proceeds of the cattle sale to her employer's bank, Bank of Commerce, and Dr. Ryder signed and delivered to the Credit Association a personal check in the identical amount of $31,894.14, which was drawn on the Bank of Commerce. This check was deposited by the Credit Association into its account at Louisiana Bank and Trust Company in Shreveport on March 30. On Friday, March 31, the Bank of Commerce received the checks from the cattle auction and, on this same date, Ryder's check to the Credit Association was presented to the defendant bank for payment through regular banking channels. Because the Mansfield Livestock checks had not as yet been collected and the balance of Dr. Ryder's account was only about $5,000, the defendant bank refused to honor Ryder's check to the Credit Association, ordered that his account be frozen and cancelled their endorsement.
The Federal Reserve Bank in Dallas was notified on the next banking day, Monday, April 3, 1978, of the dishonor and reasons therefore, and the defendant promptly returned the check through the Federal Reserve System. On April 4, 1978, the Bank of Commerce completed collection of the auction checks, Ryder's account balance rose to over $34,000 and notice of the dishonor was relayed by the Federal Reserve. The actual return of the dishonored check to Louisiana Bank and Trust Company was not completed until April 7, 1978. On April 10, the Bank of Commerce debited Ryder's account for the sum of $26,088.76 to satisfy a note the bank held in which First Medical Investors, Inc. was the maker and Dr. Ryder was an endorser. The note executed by Dr. Ryder's corporation was secured by a chattel mortgage on First Medical properties, which mortgage was signed only by First Medical Investors, Inc. and contained a setoff provision.[2] As a result, when Louisiana Bank and Trust Company requested a markup on April 11, they were informed that although the funds were no longer uncollected, the $26,088.76 setoff resulted in the account having insufficient funds to satisfy the previously discharged check. At no time after the initial dishonor and notice thereof did the Credit Association or its depository bank, Louisiana Bank and Trust Company, re-present the check to the Bank of Commerce for payment.
Plaintiff contends that the loan agreement between itself and Dr. Ryder entitled them to the proceeds of the sale of the mortgaged cattle. Because this right arose prior to the time that the defendant bank acquired any rights against Dr. Ryder in connection with the loan of First Medical Investors, Inc., the bank's right of setoff was precluded.
We granted writs to determine if the setoff by the bank to the plaintiff's prejudice was proper.

Assignment of Error Number 1
Plaintiff contends that the final renewal of the cattle loan between itself and Dr. Ryder on August 27, 1976, in which both parties agreed that the proceeds of sale would belong to the Association, was executed nearly a month before First Medical Investors obtained the loan from the defendant which was subsequently set off. As a result, plaintiff's rights to the proceeds *845 came into existence before the Bank of Commerce had any rights against Dr. Ryder as endorser on the First Medical Investors, Inc. loan. In this connection, plaintiff contends that the setoff by the defendant bank has resulted in prejudice to their rights in contravention to the mandate of C.C. art. 2215, which provides:
"Compensation can not take place to the prejudice of the rights acquired by a third person; therefore, he who, being a debtor, is [has] become creditor since the attachment made by a third person in his hands, can not, in prejudice to the person seizing, oppose compensation."
The Credit Association relies on Yung v. Magnolia Acceptance Corp., 180 So.2d 222 (La.App. 4th Cir. 1965) and Pringle Associated Mortgage Corp. v. Cox, 258 La. 499, 246 So.2d 841 (La.1971), in support of their position that there are no exceptions to the breadth of this Codal provision's application. We find these cases inappropriate to the resolution of the present dispute and plaintiff's position as to the scope of article 2215 erroneous.
In Yung, it was the finding of the court of appeal that compensation had never occurred. Though there had been an exchange of notes of identical amounts between the parties, only the note held by the plaintiff was payable on demand. The maturity date of the note in the defendant's possession was never established. As a result, the court held that the requirement that the two debts be "equally demandable" (C.C. art. 2209) to allow for compensation had not been satisfied.
In Cox, this Court denied the plaintiff's right to a setoff because the plaintiff was no longer the holder of the note in question. Justice Tate correctly pointed out that the only holder of a note is entitled to enforce its terms. It is readily apparent that both of these decisions are not applicable to the present controversy, as in neither case was compensation found to have occurred and, as a consequence, C.C. art. 2215 was not a basis of these decisions.
In applying article 2215 to the present facts, the Bank of Commerce was the "debtor". It owed Dr. Ryder the funds he had on deposit in his account with the bank. When the note which Dr. Ryder endorsed became due, the bank had become "creditor" to Dr. Ryder. Plaintiff, also a creditor, contends that once it presented its demand for payment of Ryder's check against his account in the bank, C.C. art. 2215 would not have permitted the bank as a creditor to assert compensation. It argues that the bank had an obligation to pay the check when presented and thus a valid "attachment" had been made by a third person. However, a check is not of itself an assignment of any funds in the hands of the drawee available for its payment and the drawee is not liable on the instrument until he accepts it.[3]
Consequently, there was no "attachment" made before the setoff because the Credit Association had not acquired any right to the funds and was not prejudiced. This conclusion leads us to hold that unless a third party had previously acquired rights to the funds which were the subject of the setoff, the exercise by the bank of its right of setoff against its depositor does not fall under the provision of C.C. art. 2215.
The banking industry handles a tremendous volume of transactions which involve small, as well as large, sums of money. To meet the requirements and complexities of our present financial system, the negotiable instrument has emerged as the universal method of insuring the certainty of commercial transactions. It is true that the Bank of COmmerce did have knowledge of Dr. Ryder's present financial difficulties and that the chattel mortgage on the cattle held by the Credit Association was properly recorded. But, when a bank receives a check for deposit which, in all aspects, is valid on its face and contains an endorsement on its back which recites that the payee is the sole and unconditional owner[4], *846 that bank has the right to treat that check as it would any other deposit. To require the bank to investigate the underlying transaction which led to the issuance of the instrument or to permit a third person to challenge the depositor's ownership under the present circumstances would result in an unreasonable burden upon, and disruption of, regular and normal banking transactions.

Assignment of Error Number 2
The Credit Association next argues that the defendant bank failed to procure a special mandate from Dr. Ryder to authorize a setoff, and that it has the right to attack the validity of the setoff in question.
We find that the plaintiff has no cause of action to challenge the setoff of Dr. Ryder's account. The agreement to permit compensation was between the defendant and Dr. Ryder. The Credit Association was at no time a party to the agreement and is not in the position to raise the non-existence or invalidity of such an agreement in behalf of Dr. Ryder.
Because the check was drawn on uncollected funds, the bank's dishonor of the check was not improper.[5] If the subsequent setoff of the funds was improper and had the Credit Association re-presented Ryder's check, a dishonor based on an improper setoff would have been wrongful.[6] R.S. 10:4-402 provides:
"A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item."
Thus, a bank owes a duty to its customer to avoid a wrongful dishonor of his checks. That duty cannot be enforced by the payee since the payor bank is only liable to the payee if it has certified the check or otherwise become liable on it.[7] Consequently, we need not determine whether Dr. Ryder's endorsement of the note resulted in the importation of the terms of the contemporaneously executed mortgage, including the right of setoff, into the note.
It should be noted at this point that this entire litigation was the result of the failure of the Credit Association to take adequate precautions so as to protect its claim to the cattle proceeds. The plaintiff could have avoided the disastrous consequences of the setoff merely by requesting Dr. Ryder to endorse the auction checks to it and negotiating them through their own account. It did otherwise, notwithstanding its knowledge of Ryder's poor financial condition.

Assignment of Error Number 3
Plaintiff asserts that because the defendant bank knew, or should have known, of its interest in the proceeds from the sale of the cattle, it is entitled to recover under the "trust fund" principle. It is not in dispute that two years earlier, Dr. Ryder furnished a financial statement to the Bank of Commerce. From this document, the doctor's unstable financial condition and a listing of his then existing creditors, including the plaintiff, was apparent. It is argued that this financial statement, coupled with Dr. Ryder's unusually large deposit ($31,894.14) and plaintiff's attempts to collect on the personal check from Dr. Ryder for the same amount, put the bank on notice that the plaintiff possessed a beneficial interest in the sale proceeds. Plaintiff concludes that this interest barred the bank's right of setoff. To support its position, the Credit Association cites Merchants and Farmers Bank and Trust Co. v. Hammond Motor Co., 164 La. 57, 113 So. 763 (1927) and Succession of Boisblanc, 32 La.Ann. 109 (1882).
In Succession of Boisblanc, McCullough and Sons tendered a $1,500 check to Boisblanc, a New Orleans broker. This check *847 named McCullough as the payee, but had been specially endorsed by them in favor of Boisblanc. He was to invest this sum in the purchase of sugar and molasses in behalf of McCullough. Boisblanc had the check discounted and deposited the proceeds into his personal bank account. Boisblanc subsequently died, and both the administrator of his estate and McCullough and Sons claimed the funds from the deposit of the check. The court found that Boisblanc held the funds in trust for McCullough and Sons. This decision was based on the fact that (1) McCullough was the owner of the funds and (2) Boisblanc was the agent of McCullough and was entrusted with the funds for a special purpose.
In Hammond Motors, promissory notes were issued in favor of Citizens National Bank by Hammond Motor Company. The bank was authorized to set off deposits against the balance due on the notes. Subsequently, an account was created for the special purpose of paying particular creditors, as Hammond Motors made a cash sale of all of its assets. This special accounts was opened as "Hammond Motors, Escrow" and the bank was notified that no check on that account was to be honored unless signed by Hammond Motors and their attorney. When the bank went into receivership, the bank was precluded from exercising its right of setoff. The court held that under the circumstances, the account was in the nature of a trust fund, and formed no part of the debtor's general checking account.
We agree with the conclusion of the court of appeal that these cases cited by the plaintiff are factually distinguishable from the present controversy. As a result, the Bank of Commerce had no duty to inquire into the source of the auction checks, nor the purpose for which they were deposited.
The Credit Association negligently failed to protect its interest in the sale of the cattle. Dr. Ryder was given absolute freedom to sell the encumbered cattle at any place or time. The court of appeal, 395 So.2d 862 (La.App.), correctly observed that Dr. Ryder was not an employee, agent or fiduciary of the Credit Association. The only restriction placed on Dr. Ryder was that the amount received be applied to the chattel mortgage held by the Association. Dr. Ryder deposited the checks received from the sale of his cattle into his general checking account. No special account was set up to insure payment to the Credit Association. When issued, the cattle auction checks named Dr. Ryder as payee. As a consequence, he was not only the owner of the checks, but was also the only party who could present the checks for payment, or negotiate them to a third party. Had Dr. Ryder desired the Credit Association to have an interest in these checks, an endorsement in their favor would have insured that result. Instead, Dr. Ryder chose to deposit the checks into his personal checking account at the Bank of Commerce. These checks met all the requisites of negotiability, were properly issued to Dr. Ryder as payment for the sale of his cattle and were promptly presented to the Bank of Commerce for collection. Based on these facts, there is no reason to apply the "trust fund" principle to allow recovery.

Assignment of Error Number 4
The Credit Association deposited Dr. Ryder's personal check into its account at Louisiana Bank and Trust Company. This check was then routed through the First National Bank of Shreveport, a RCPC (regional check processing center) and, ultimately, to the drawee, the Bank of Commerce. On this date, March 31, the 16 checks deposited in the Bank of Commerce by Dr. Ryder had not yet been collected. As the funds actually in his account were not sufficient to pay the check to the Credit Association, this check was returned. Notice of dishonor was given in the next banking day, Monday, April 3, to the Federal Reserve Bank in Dallas,[8] which gave notice *848 to the First National Bank, which ultimately notified plaintiff's depository bank, the Louisiana Bank and Trust Company. Before the passage of the midnight deadline, the check itself was returned through the same channel. Because of this route, the dishonored check was not received by Louisiana Bank and Trust until Friday, April 7. Upon learning of the dishonor, the Credit Association and Dr. Ryder made inquiries to determine the reasons for the payor bank's return of the check.
Plaintiff claims that they are entitled to recover because the defendant bank routed the dishonored check through channels which unduly delayed its return. It is further argued that statements given by the defendant's employees relative to the status of Dr. Ryder's account misled the Credit Association. We find both of these claims to be wholly without merit.
The testimony of both Mr. Love, Executive Vice-President of the defendant, and Mr. Cox, the defendant's President, thoroughly explained the routing of the returned check. An examination of this explanation reveals that the defendant bank acted most prudently.
Though Louisiana Bank and Trust does clear checks with the First National Bank of Shreveport, the Bank of Commerce does not do so. Therefore, the check was returned through the Federal Reserve System, which was the defendant's normal banking channel. Had the defendant attempted to short-cut this procedure, the bank which directly received the check (First National Bank) could have returned it to the defendant and asked them to make use of normal channels. Such an occurrence would have resulted in the Bank of Commerce retaining possession of the check for more than 24 hours and required them to pay the check regardless of whether the item was good or bad.[9]
It should be noted at this point that the returned check was never re-presented for payment, and it was not until April 10, seven days after notice of dishonor was sent, that the bank set off against Dr. Ryder's account. We find the testimony of Mr. Love and Mr. Cox to be of most significance on this matter:
"Counsel: If that check had been presented as a collection item on April the 7th, and those were then collected funds on deposit in Dr. Ryder's account, what would you have done?
Mr. Love: I really don't think we would have had any choice but to pay the check.
Counsel: All right. But it was not presented or put in the bank as a collection item, was it?
Mr. Love: No, sir."

* * * * * *
"Counsel: Now, as I understand it, those funds represented by Dr. Ryder's deposit became collected funds on or about April 4, 1978; is that correct, sir?
Mr. Cox: Yes, sir.
Counsel: And your debit was affected on April 10, 1978; is that correct, sir?
Mr. Cox: Yes, sir.
Counsel: All right. So during that period of time, had an item been presented against those collected funds, what would you have done?
Mr. Cox: That collection item would have had to be paid.
Counsel: But no collection item was ever presented there, was it?
Mr. Cox: No, sir."
*849 Upon learning that the check of Dr. Ryder would not be honored by the defendant bank, plaintiff attempted to ascertain the reasons for the return. Although the Credit Association, as a third party, had no right to information relative to the status of Dr. Ryder's account, its claim of misrepresentation requires us to examine what statements were made by the defendant. Plaintiff claims that it was led to believe that a re-presentment would have been a futile act and, thus, it was deprived of the opportunity to collect on Dr. Ryder's check.
Dr. Ryder's personal check to the Credit Association was presented to the Bank of Commerce for payment on April 3, 1978. As of that date, the auction checks deposited by Ryder had not yet cleared through banking channels. Consequently, over $31,000 recorded to Ryder's account consisted of uncollected funds. The bank therefore refused to pay Ryder's personal check and returned the item through the Federal Reserve System. Mrs. McBride, Dr. Ryder's secretary, contacted the bank the next day, April 4, and inquired why there were "insufficient funds." Earlier this day, final payment on the auction checks was made to the Bank of Commerce. This raised the actual balance in Ryder's account to over $34,000. Accordingly, the bank employee, relying upon bank records, told Mrs. McBride that Dr. Ryder had a balance of over $34,000 and that she could not find a check returned because of insufficient funds. This response was a true and accurate statement as to the status of Dr. Ryder's account. When Dr. Ryder's personal check was presented for payment, the funds in question were "uncollected", and not "insufficient."
After the time of the return and before the secretary's inquiry, the funds were collected, so that the bank's records accurately reflected the balance of Dr. Ryder's account.
On April 10, Mrs. McBride again inquired why Ryder's check was not paid. She was informed that there were insufficient funds to cover the check. This statement was completely true, as the 16 auction checks had not only been collected by this date, but were the object of the setoff. As a result, Dr. Ryder's account was insufficient at this time to cover his personal check to the Credit Association. We feel that though there may have been some confusion in the exchange of information, the defendant bank did not mislead anyone.

Assignment of Error Number 5
Finally, it is claimed by the Credit Association that the defendant bank granted a moratorium with respect to Dr. Ryder's indebtedness. A review of the testimony given at trial reflects the erroneous position of the plaintiff.
The Bank of Commerce admitted that discussions took place between it and Dr. Ryder. Though the possibilities of a moratorium were raised, it is clear that no binding agreement was reached because of the inability to get all of Dr. Ryder's other creditors to postpone their claims. According to the testimony of Dr. Ryder, the only "agreement" between himself and the Bank of Commerce was the need for Dr. Ryder to liquidate his assets and to "apply the proceeds appropriately." The proposed plan never progressed beyond this initial statement of intent. When asked if the plan was not final, Dr. Ryder responded, "That's correct." This statement supports the position of the defendant that the parties never reached a binding commitment. At most, the testimony reflects the Bank of Commerce's interest in Dr. Ryder's financial rehabilitation.

Conclusion
The record reveals that both the plaintiff and the defendant were creditors of Dr. Ryder. Both parties were aware of his financial status and each was experienced in the type of financial matters presented in this case. Though it was the intention of Dr. Ryder that the proceeds from the sale of his cattle were to be awarded to the Credit Association, his actions, coupled with plaintiff's total failure to protect its interest, thwarted this result. The Bank of Commerce responded to Dr. Ryder's situation *850 in a most prudent manner. By exercising its right of setoff, the Bank insured that at least a portion of the indebtedness would be extinguished. The plaintiff, under the present circumstances, ought not be permitted to cry "foul". Its poor judgment should not be a basis to penalize the defendant.
For these reasons, we affirm the decisions of the lower courts in favor of the Bank of Commerce.
DIXON, C. J., dissents with reasons.
CALOGERO, J., dissents for reasons assigned by DIXON, C. J.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
If the payee of a check is damaged by the wrongful dishonor of the instrument by the maker-depositor's bank, there is no reason and no authority to deny recovery by the payee. It is essential, therefore, to determine whether the bank had obtained the right, from Ryder, to compensation or offset. If, not, there should have been a mark-up on April 11 and the check should have been honored when presented again.
NOTES
[1] After the filing of this suit, Shreveport Production Credit Association and Arcadia Production Credit Association merged to form Northwest Louisiana Production Credit Association.
[2] "When the note which evidences this consumer loan shall become due for any reason provided in the note or chattel mortgage with which it is identified, any money, stocks, bonds or other property of any nature whatsoever on deposit with, whether general or special, or held by, or in possession of mortgagee as collateral or otherwise, to the credit of or for the account of the makers, endorsers, guarantors, or sureties or any of them, shall be applied to the payment of the note."
[3] See R.S. 10:3-409.
[4] Each of the 16 auction checks was endorsed as follows: "This check was to the payee for livestock and by endorsing same, the payee guarantees that he is the sole and unconditional owner of such livestock and there are no liens and/or chattel mortgages on same."
[5] H. Bailey, Brady on Bank Checks, § 18.1 (1979) (5th Ed.).
[6] Bailey, supra, § 18.7.
[7] Bailey, supra, § 18.9.
[8] R.S. 10:3-508(2)

"(2) Any necessary notice must be given by a bank before its midnight deadline and by any other person before midnight of the third business day after dishonor or receipt of notice of dishonor."
[9] R.S. 10:4-302

"In the absence of a valid defense such as breach of a presentment warranty, settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of (a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or (b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents."