**CHRYSLER CREDIT CORPORATION**

v.

**WHITNEY NATIONAL BANK, et al.**

**Civ. A. Nos. 91–1727, 91–4256 and 91–4257.**

United States District Court, E.D. Louisiana.

July 1, 1992.

McGlinchy, Stafford, Cellini, Lang, Rudy J. Cerone, Charles R. Penot, Anthony J. Rollo, New Orleans, for plaintiff.

Milling, Benson, Woodward, Hillyer, Pierson and Miller, David McLean Culpepper, Talmadge M. Watts, John Tsai, New Orleans, for defendants.

## ORDER AND REASONS FOR RULING

CLEMENT, District Judge.

Chrysler Credit Corporation's Motion for Partial Summary Judgment, Whitney National Bank's Motion for Partial Summary Judgment, Chrysler Credit Corporation's Motion to Strike Exhibits and Chrysler Credit Corporation's Motion to Strike Portions of Whitney's Motion Papers were decided this date on memoranda.

Chrysler's Motion to Strike Exhibits is DENIED, and, for the reasons stated below, Chrysler's Motion for Partial Summary Judgment is DENIED and Whitney's Motion for Partial Summary Judgment is DENIED and Chrysler's Motion to Strike Portions of Whitney's Motion Papers is DENIED as MOOT.

## I. BACKGROUND

Plaintiff Chrysler Credit Corp. (Chrysler) was the floor plan lender for Toyota of Jefferson, Inc. (TOJ), an automobile dealership. As the floor plan lender, Chrysler financed TOJ's inventory of new automobiles. These credit advances made by Chrysler to TOJ were secured under a "Security Agreement and Master Credit Agreement" by TOJ's new and used motor vehicle inventory and the proceeds derived from inventory sales.

Upon sale of a car from inventory, the sales proceeds were temporarily held by TOJ until repaid to Chrysler. Defendant Whitney National Bank (Whitney) was the principal banker for TOJ.

During the 18 month period of the floor plan agreement (February 28, 1989—September 28, 1990), Whitney established the practice of covering TOJ's checks to Chrysler when there were insufficient funds in the TOJ account. In addition, Whitney made personal loans to the owners of TOJ. The overdraft loans and other loans to TOJ were secured by an Act of Pledge executed by TOJ on November 28, 1989.

At times, TOJ did not pay for cars as they were sold. Instead, TOJ deposited the proceeds from the car sales into its account with Whitney. Whitney, in turn, set off the accounts in satisfaction of the outstanding loans and overdrafts Whitney paid.

Chrysler contends that Whitney, through its arrangement with TOJ, converted proceeds belonging to Chrysler by virtue of Chrysler's security interest in those proceeds. Whitney contends that it had a right to setoff the funds in TOJ's account which was superior to any security interest that Chrysler had in those funds. In the alternative, Whitney contends that Chrysler's security interest in the proceeds did not establish a "right of possession" in the funds sufficient for Chrysler to maintain a conversion action. In the alternative, Whitney claims that it had a right of subrogation, because it paid off Chrysler.

## II. ELEMENTS OF CONVERSION

■ To prevail on a conversion claim under Louisiana law, Chrysler must prove that (1) it owned or had the right to possess funds that were misused by Whitney, (2) the misuse was inconsistent with Chrysler's rights of ownership, and (3) the mis-

use constituted a wrongful taking of the funds. *Chrysler Credit Corp. v. Perry Chrysler Plymouth,* 783 F.2d 480, 484 (5th Cir.1986). It is generally not required that a plaintiff prove any intent, malice, etc. on the part of the defendant in a conversion action. *Id.*

In this case, the central dispute is over the first requirement of a conversion action—that the plaintiff "own" or have the "right to possess" the converted property.

## III. CHRYSLER'S RIGHT TO POSSESS THE PROCEEDS

The question of whether Chrysler had a right to possess the funds at the time of setoff is a complex question that must be resolved in two parts.

The first inquiry is one of priority of interests—that is, does Chrysler's interest, if any, in the proceeds of TOJ's sale of collateral have priority over Whitney's interest, if any, in the TOJ account?

The second inquiry is whether the commingling of the proceeds with other TOJ funds invalidates Chrysler's security interest in the proceeds or otherwise precludes a conversion action. Even if the Court were to find that Chrysler's security interest has priority, Chrysler must overcome the commingling problem.

### A. The Parties' Interests

#### 1. *Chrysler's Interest in the Proceeds*

■ Chrysler asserts that it had a first priority security interest in the proceeds from sales of new cars by TOJ, a proposition that Whitney denies.

Section 3.0 of the Security Agreement between Chrysler and TOJ provides as follows:

> Debtor hereby grants to Secured Party a first and prior security interest in and to each and every Vehicle financed hereunder, whether now owned or hereafter acquired by way of replacement, substitution, addition or otherwise, together with all additions and accessions thereto *and all proceeds thereto* (emphasis added).

Security interests in proceeds of mortgaged properties are explicitly authorized by La.R.S. 9:5386(A), which was in effect when the Security Agreement was entered on February, 1989:

> A mortgage agreement may provide for the collateral assignment or pledge of incorporeal rights that are or may be incidental or accessory to the mortgaged property or its use ... The incorporeal rights shall include ... [t]he right to receive proceeds attributable to the sale, lease, insurance loss, or condemnation of the mortgaged property.

The explicit language of the Security Agreement and the relevant statute make it clear that Chrysler had a valid security interest in the proceeds from the sale of financed automobiles by TOJ. Under the statute, Chrysler's contractual right to receive proceeds from the sale of collateral is a right which is "incidental or accessory" to its rights in the collateral, rather than an interest arising independently from its rights in the collateral. It follows that Chrysler's interest in the proceeds represents a continuation of its interest in the collateral, which was created by execution of the Security Agreement.

To be effective against third persons, such as Whitney, a mortgage such as Chrysler's must be recorded "in the manner provided by law." La.R.S. 9:5387(A). It is not disputed here that Chrysler recorded its mortgage of TOJ's property soon after the agreement was entered, in February 1989. Accordingly, Chrysler's security interest in the collateral and proceeds was effective against third parties as of that date.

#### 2. *Whitney's Interest in the TOJ Account*

Whitney contends that it had a security interest in the funds held in the TOJ account that was superior to any security interest that Chrysler had in those funds.

It is not disputed that Whitney was a creditor of TOJ's. Whitney had covered TOJ's overdrafts, which, legally, functions as a loan from Whitney to TOJ. In addition, Whitney had made other loans to TOJ.

#### a. Whitney's right of set-off

■ La.R.S. 6:316 provides banks with the statutory right to set off accounts of depositors who are in default on obligations to the bank. La.R.S. 6:316(C) provides that

> [i]n the event that the depositor should default under any loan, extension of credit or other direct or indirect obligation in favor of the depository bank, the bank shall have the right to apply any and all funds that the depositor then has on deposit with the bank towards the payment of the depositor's indebtedness or obligations, whether such payment satisfies the indebtedness in whole or part. The exercise of the bank's remedies under this Subsection shall not affect any other rights and remedies available to the bank following the depositor's default.

In order to avail itself of the statutory set-off remedy provided in La.R.S. 6:316(C), the bank must comply with the notice requirement of La.R.S. 6:316(D):

> The bank shall notify the depositor in writing within two business days following the exercise of the bank's remedies under Subsection C of this Section. Such notice shall be forwarded by registered or certified mail to the depositor's most current address reflected in the bank's records ...

Whitney has not provided the Court with any evidence that it provided TOJ with notice of setoff as required by La.R.S. 6:316(D). In addition, Whitney has not established that TOJ was in "default" as required by La.R.S. 6:316(C). Accordingly, Whitney cannot avail itself of the statutory setoff remedy.

■ However, La.R.S. 6:316(E) provides that the "rights and remedies afforded to banks under this Section shall be in addition to a depository bank's contractual rights of compensation and setoff as provided in customer notes and agreements." Whitney contends that it had a contractual right of setoff pursuant to its various agreements with TOJ. Whitney notes that Paragraph 11 of Whitney's Rules & Regulations Governing Deposit Accounts, which binds all Whitney depositors, provides that

> We [Whitney] may at our sole option pay an overdraft ... We may deduct any amounts that are due to us from your account at any time without prior notice to you.

Accordingly, Whitney had a contractual right to set off TOJ's accounts to collect amounts due on overdraft loans.

It should be noted here that Whitney's right of set-off is not a "security interest," but, rather, is in the nature of a lien. Professor Gilmore, the father of UCC Article 9, has explained:

> Of course a right of set-off is not a security interest and never has been confused as one ... A bank's right of set-off against a depositor's account is often loosely referred to as a "banker's lien," but the "lien" usage has never led anyone to think that the bank held a security interest in the bank account.

Gilmore, *Security Interests in Personal Property*, pp. 315–16 (1965), *as quoted in Insley Mfg. Corp. v. Draper Bank & Trust*, 717 P.2d 1341, 1344 (Utah 1986); *Associates Discount Corp. v. Fidelity Union Trust Co.*, 111 N.J.Super. 353, 268 A.2d 330, 332 (1970).

#### b. Whitney's Security Interest in the Account

Whitney contends that, in addition to having a right of set-off against TOJ, it had a security interest in the TOJ account. TOJ executed an Act of Pledge encumbering certain property of TOJ to secure any debts the dealership might owe to Whitney. This property encumbered by the Act of Pledge includes "all money and funds on deposit, including balances held in checking, savings or custodian accounts."

The Act of Pledge creating Whitney's security interest was executed on December 28, 1989. This occurred seven months after Chrysler's security interest in the TOJ proceeds was created.

### 3. *Priority Principles Under Louisiana Law*

The question of whether a creditor with a perfected security interest in proceeds of collateral has priority over the bank's right

to setoff appears to be a question of first impression under Louisiana law. However, from a review of (1) the most relevant Louisiana statutory and decisional law, and (2) decisions from other jurisdictions concerning this fact pattern (with a particular emphasis on those decided under common law priority rules), the Court can determine the priority rule that the Louisiana Supreme Court would most likely adopt for the fact pattern in the case at bar.

### a. *Shreveport Production*, Security Interests and Setoff

Whitney contends that its right of setoff is superior to any security interest that Chrysler had. Whitney relies heavily on *Shreveport Production Credit Assn. v. Bank of Commerce*, 405 So.2d 842 (La. 1981). In *Shreveport Production*, the plaintiff Credit Association had made loans to the debtor, a cattle-raiser. The loans were evidenced by a note and secured by a chattel mortgage over the debtor's entire herd of cattle. The note was not paid when it matured, and at that time, the debtor and the credit association agreed that the debtor would sell his herd and equipment, the proceeds to be applied to the balance due on the loan. The cattle were sold at auction, and the debtor received sixteen checks in the total amount of $31,894.14 on March 28, 1978. The next day, March 29, the debtor wrote a check in the identical amount, drawn on the defendant bank. On March 30, the plaintiff credit association deposited this check in its account at a second bank. *Id.* at 843–44.

On March 31, the defendant bank received the checks representing the proceeds from the cattle auction, and on the same date, the debtor's check to the credit association was presented to the defendant bank for payment. After the checks representing the auction proceeds were deposited into the debtor's account at the defendant bank, the bank set-off the account in the amount of the debtor's outstanding balance on loans from the bank. When the debtor's check to the credit association was presented for payment, the bank dishonored the check because of insufficient funds in the debtor's account. *Id.*

The *Shreveport Production* court held that there was no wrongful dishonor by the bank because the plaintiff credit association had no right to the funds:

> [T]here was no attachment made before the setoff because the Credit Association had not acquired any right to the funds and was not prejudiced. This conclusion leads us to hold that unless a third party had previously acquired rights to the funds which were the subject of the setoff, the exercise by the bank of its right of setoff against its depositor does not fail under the provisions of C.C. art. 2215.

*Id.* at 845. Relying on La.R.S. 10:3–409, the court held that the presentation of a check for collection did not give the credit association any rights in the proceeds that were superior to the defendant bank's.[1] Courts have uniformly held that, under UCC § 3–409, a check does not of itself operate as an assignment of the drawer's funds in the drawee bank. *See, e.g., Atlantic Cement Co. v. South Shore Bank*, 730 F.2d 831, 38 UCCRS 539 (1st Cir.1984) (Massachusetts UCC); *Carmichael v. General Electric Co.*, 102 A.D.2d 838, 476 N.Y.S.2d 606 (2d Dept. 1984).

Thus, *Shreveport Production* is distinguishable from the case at bar, because the credit association in *Shreveport Production* did not have "any right to the funds." The credit association had an interest in the collateral itself, but had no interest in the proceeds. The court properly concluded that where the third party had not previously acquired rights to the funds, the bank's right of setoff does not fail.

Unlike the plaintiff credit association in *Shreveport Production*, Chrysler did have rights in the proceeds from the sale of collateral by TOJ. These rights arose from

---

[1]. The *Shreveport Production* decision is based on the law of negotiable instruments, and contains no analysis of priority rules or other references to the law of secured transactions. *See* Hersbergen, "Negotiable Instruments: Defenses to Payment, Parol Evidence Problems," 44 La. L.Rev. 247, 260 (1983).

the Security Agreement between Chrysler and TOJ.

Whitney claims that *Shreveport Production* establishes that a depository institution always has the right to setoff, regardless of whether there was a prior security interest on the funds deposited into the account. However, as noted above, the *Shreveport Production* court explicitly held that *"unless a third party had previously acquired rights to the funds which were the subject of the setoff,* the exercise by the bank of its right of setoff against its depositor does not fail" (emphasis added). 405 So.2d at 845. By negative implication, if a third party had previously acquired rights to the funds which were the subject of the setoff, as Chrysler did, the setoff might fail.

> b. Was *Shreveport Production*
> legislatively overturned by
> La.R.S. 9:5386–87?

Chrysler contends that the *Shreveport Production* holding was legislatively overturned by the adoption of La.R.S. 9:5386–87 in 1987. This is not true. The Editor's Note to Acts 1988, No. 985, which includes La.R.S. §§ 9:5386–87, states that

> With the exception of R.S. 9:5387(B) [2] and 5390(C), the provisions of this Act merely confirm and codify established customs and practices ...

Consequently, Chrysler's assertion that the enactment of La.R.S. §§ 5386–87 provided Louisiana creditors with "an automatic continuing security interest in proceeds derived from sale of goods subject to a Louisiana chattel mortgage or collateral chattel mortgage" is erroneous.

■ *Shreveport Production* is consistent with La.R.S. 5386(A). The statute provides that a "mortgage *may* provide for the collateral assignment or pledge of incorporeal rights," including proceeds from the sale of collateral (emphasis added). However, the statute does not, as Chrysler suggests it does, *automatically* create a

---

**2.** *See* discussion, in Section III(3)(e) of this order, *infra,* concerning the irrelevance of La.R.S. 9:5387(B) to this matter.

**3.** Chrysler's security interest in the proceeds was created by its agreements with TOJ, not by

---

security interest in the proceeds of disposed collateral.[3] *Cf.* La.R.S. 10:9–306 (UCC Article 9 does automatically create security interest in proceeds).

> c. The Bank's Right to Rely on the Debtor's Ownership of Funds, under La. R.S. 6:317 and *Shreveport Production*

Whitney further contends that La.R.S. 6:317, which provides that a bank may rely on the depositor's ownership of funds in the depositor's account, establishes the bank's right to setoff under any circumstances. As Whitney points out, La.R.S. 6:317, enacted in 1988, does embody many of the principles of *Shreveport Production.* La.R.S. 6:317 provides that

> A bank may conclusively rely on an application, agreement or signature card used to establish a deposit account as establishing ownership of any and all funds and other credits deposited therein, and may consider and treat any and all funds on deposit in such an account as belonging to and the sole and exclusive property of the depositor or depositors named on the account application, agreement or signature card, unless otherwise notified or directed by such depositor or depositors.

This language is quite similar to language found in *Shreveport Production:*

> [W]hen a bank receives a check for deposit, which, in all aspects, is valid on its face and contains an endorsement on its back which recites that the payee is the sole and unconditional owner, that bank has the right to treat that check as it would any other deposit. To require the bank to investigate the underlying transaction which led to the issuance of the instrument or to permit a third person to challenge the depositor's ownership under the present circumstances would result in an unreasonable burden upon, and

---

statute. La.R.S. 9:5386(A), which embodied prior Louisiana custom, allowed Chrysler to create by contract a continuing interest in the proceeds of the collateral, but did not itself create that interest.

disruption of, regular and normal banking transactions.

405 So.2d at 845–46. Whitney contends that this language in *Shreveport Production* and La.R.S. 6:317 establishes the bank's absolute right to setoff.

Whitney is mistaken. La.R.S. 6:317, as quoted above, provides that a bank may rely on the depositor's ownership of the funds in the account "unless otherwise notified or directed by such depositor or depositors." Thus, if Whitney was "notified" by the "depositor," TOJ, of Chrysler's security interest in the funds, then La.R.S. 6:317 does not apply.[4] The exact knowledge Whitney had of Chrysler's security interest at the time of set-off, and whether it obtained this knowledge from TOJ, is a disputed question of fact to be resolved at trial.

■ The notification exception is consistent with the holding of *Shreveport Production.* The essence of La.R.S. 6:317, and the comparable language in *Shreveport Production,* is that it would be unreasonable to impose upon banks the duty to determine whether any parties other than the depositor have an interest in funds deposited into the account. It is well settled under Louisiana law that a bank does not have a duty to inquire as to the origin of funds deposited into accounts. *Shreveport Production,* 405 So.2d at 854–46; *Guidry v. Bank of LaPlace,* 954 F.2d 278, 286–87 (5th Cir.1992). This principle is irrelevant, however, where the bank *knows of* the circumstances surrounding the deposit. And where the bank is in collusion with the debtor at the expense of a senior creditor, as Chrysler alleges, this is especially true.

■ One could argue that *Shreveport Production* contradicts La.R.S. 6:317, as the Court noted that the bank did have knowledge of the debtor's "financial difficulties and the chattel mortgage on the cattle."[5] However, a close reading of *Shreveport Production* reveals that the case is quite consistent with the statute. As quoted above, the Court held that

> to require the bank to investigate the underlying transaction which led to the issuance of the instrument or to permit a third person to challenge the depositor's ownership *under the present circumstances* would result in an unreasonable burden upon, and disruption of, *regular and normal* banking transactions. (emphasis added)

405 So.2d at 846. In *Shreveport Production,* there was no allegation that the bank's setoff of funds was anything other than a "regular and normal banking transaction." Consequently, the bank's setoff of funds and subsequent dishonor of the check presented by the credit association were appropriate. If there is something akin to fraud or collusion, as Chrysler alleges in this case, rather than a "regular and normal banking transaction," the general rule of La.R.S. 6:317 and *Shreveport Production* has no application.[6]

### d. La.R.S. 6:312(E)

Whitney notes that La.R.S. 6:312(E)[7] allows banks to prohibit depositors from

---

**4.** It certainly appears that TOJ "notified" Whitney of Chrysler's interest in the proceeds. *See* July 24, 1990 Memorandum from Brent Smith (TOJ) to David Andignac (Whitney) ("If you would bounce a check then it would be all over with Chrysler Credit").

**5.** Of course, to the extent that *Shreveport Production,* a 1981 case, is in conflict with La.R.S. 6:317, a 1986 statute, the statute will control. However, as the analysis below indicates, there is no conflict.

**6.** The UCC is in accord with this reasoning. Comment 2(c) to § 9–306 provides as follows: Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in the ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

**7.** "Notwithstanding any other law to the contrary and as an exception to R.S. 10:9–318(4), any federally insured financial institution may by contract prohibit or otherwise limit the pledge, assignment, collateral assignment, or granting of any other type of security interest in

granting security assignments in any deposit account, and that a provision of Whitney's Rules and Regulations does so limit TOJ.[8] However, Whitney overlooks the fact that La.R.S. 6:312(E) was not in effect until September 1, 1989, after the execution of the Chrysler–TOJ Security Agreement and after the creation of TOJ's Whitney account. Second, and more importantly, Chrysler has never had a security interest in the TOJ *account*. Chrysler's security interest is in the *proceeds* of the sale of its collateral. Whitney and TOJ cannot, by entering a contract, preclude Chrysler's interest in the proceeds.

### e. La.R.S. 9:5387(B)

Whitney contends that, under La.R.S. 9:5387(B), a proceeds-secured creditor can only attach funds in unencumbered deposit accounts. Whitney overlooks the fact that La.R.S. 9:5387(B) only applies "following the mortgagor's or debtor's default." In this case, the alleged conversion occurred prior to TOJ's default to Chrysler.

### f. A Pre–UCC Priority Rule Consistent With Pre–Article 9 Louisiana Law

Since this priority dispute cannot be resolved under existing Louisiana statutory or common law, other authority must be considered.

As Chrysler points out, the overwhelming weight of authority indicates that a security interest in the proceeds of collateral, such as Chrysler's, has priority over a bank's contractual or statutory right of setoff of funds in depositors' accounts. *See, e.g., Harley–Davidson Motor Co. v. Bank of New England,* 897 F.2d 611 (1st Cir.1990) (Rhode Island UCC); *Griffin v. Continental Life Ins. Co.,* 722 F.2d 671 (11th Cir.1984) (Georgia UCC); *Citizens' National Bank of Whitley County v. Mid–States Development Co.,* 177 Ind.App. 548, 380 N.E.2d 1243, 1244 (1978). *See also cases cited in* Harrison, "Effect of UCC Article 9 Upon Conflict, as to Funds in

Debtor's Bank Account, Between Secured Creditor and Bank Claiming Right of Set-off," 3 A.L.R.4th 998 (1991 Supp.). Professor Hawkland[9] has stated that the result would be the same under Louisiana law, despite the strong set-off rights of banks under La.R.S. 6:316. Hawkland, *Hawkland's Handbook on Chapter 9 Louisiana Commercial Law,* § 3:37 (1990).

Whitney argues that these cases are inapposite because Whitney had a security interest in the debtor's account by virtue of TOJ's Act of Pledge. However, even where the bank has a more senior security interest in the account, an inventory creditor's security interest in the proceeds typically has priority over the bank's right of setoff. *Coachmen Industries, Inc. v. Security Trust & Sav. Bank,* 329 N.W.2d 648, 35 UCCRS 1012 (Iowa 1983); Rauer, "Conflicts Between Set–Offs and Article 9 Security Interests," 39 Stan.L.Rev. 235, 249 (1986).

More importantly, in this case, Chrysler's security interest in the collateral and "incidental" interest in the proceeds, which was created nine months before Whitney's security interest in the account, is first-in-time. *Cf. State Bank of Rose Creek v. First State Bank of Austin,* 320 N.W.2d 723 (Minn.1982) (bank has priority where creditor's interest in certificate of deposit did not attach until *after* CD was deposited into account). Professor Hawkland has suggested that a bank with a security interest "over and above its set-off rights" might possibly have priority over the proceeds-secured creditor. Hawkland, *supra,* at § 3:37. *See also* Rauer, 39 Stan.L.Rev. at 250–52 (arguing that a bank with a senior security interest should have priority over a proceeds-secured creditor). However, it cannot seriously be argued that a bank with a junior security interest should have priority over a more senior creditor.

---

any deposit account maintained or established at such institution, including those deposit accounts evidenced by certificates of deposit issued by such institution."

**8.** *See* Whitney's Rules and Regulations, ¶ 12.

**9.** Professor Hawkland of Louisiana State University, one of the nation's premier UCC scholars, drafted Louisiana's version of Article 9 upon request of the governor, and is uniquely qualified to comment on the relationship between La.R.S. 6:316 and priority rules.

Whitney also argues that decisions from other jurisdictions are irrelevant because they are based on Article 9 of the Uniform Commercial Code (UCC), which was not in effect in Louisiana at the time. Whitney's suggestion that the Court ignore all authority which is dependent upon Article 9 is quite problematic because (1) there are no Louisiana decisions or statutes directly on point and (2) every other jurisdiction in the country adopted Article 9 before Louisiana did. *See, generally*, Gabriel, "Louisiana Chapter Nine (Part One): Creating and Perfecting the Security Interest," 35 Loy. L.Rev. 311, 312 (1990). Furthermore, cases decided under UCC Article 9 are relevant not only because they are essentially the only authorities available, but also because many of the decisions, as described below, are based on common law principles established long before the UCC ever existed.

Although the courts have nearly unanimously found that the secured creditor's interest in proceeds has priority over the bank's right to setoff, the courts have reached this result in different ways. Rauer, 39 Stan.L.Rev. at 249; Lacy, "Conflicting Security Interests in Inventory and Proceeds Under the Revised Article 9 of the Uniform Commercial Code," 41 S.C.L.Rev. 247, part III(B)(2)(b)(iii) (1990).

Section 9–104(i) of the UCC excludes bank set-offs from the scope of Article 9. Most courts read section 9–104(i) narrowly, that is, as excluding only the creation of set-offs from the scope of Article 9. Applying Article 9 priority rules, these courts unanimously find that the inventory creditor's interest in the proceeds has priority under section 9–201. These authorities only offer limited guidance to this Court, because the UCC's priority rules were not part of Louisiana law at the relevant time.

Some courts have construed section 9–104(i) broadly, completely removing the priority dispute from Article 9's priority scheme. These courts have applied non-Code law to resolve priority conflicts between inventory creditors and banks exercising their right of set-off.

Two common law rules have developed to resolve this type of conflict.

The first is known as the "legal rule," which "subordinates the bank's right to set-off if the bank has knowledge of facts that would reasonably cause a prudent person to inquire as to the source of funds, and a reasonable inquiry would have disclosed that the funds were cash proceeds subject to a security interest." Lacy, 41 S.C.L.Rev. 247, at part III(B)(2)(b)(iii). These courts apply the well-settled principle, derived from trust law, that a bank may not set-off funds of a third person deposited in the debtor's name. Barnes, "Tracing Commingled Proceeds: The Metamorphosis of Equity Principles Into UCC Doctrine," 51 U.Pitt.L.Rev. 281, 333 (1990); Ricketts, "Bank's Right to Apply Third Person's Funds, Deposited in Debtor's Name, on Debtor's Obligation," 3 A.L.R.3d 235 (1966). In *National Acceptance Co. of America v. Va. Capital Bank*, 498 F.Supp. 1078 (E.D.Va.1980), *rev'd on other grounds*, 673 F.2d 1314 (4th Cir.1981), for example, the court applied Virginia's common law rule which provides that the bank has the right to set-off funds unless it has notice of a third party's interest:

> Virginia adheres to the majority rule that if the bank can be charged with knowledge of the interest of a third party in a deposit account, or notice of facts sufficient to put it on inquiry that such an interest exists, it may not apply the account to satisfy a debt owed by the depositor.

*Id.* at 1083.

The second is known as the "equitable rule." Under this rule, the bank cannot set off funds "unless it has detrimentally changed its position in reliance on the debtor's ownership of the funds," regardless of whether it has notice of the creditor's security interest. *Id. See, e.g., Commercial Discount Corp. v. Milwaukee W. Bank*, 61 Wis.2d 671, 214 N.W.2d 33, 39 (1974). Under this rule, it is extremely difficult for the bank to overcome the priority of the inventory financier, even where it had no knowledge of the creditor's security interest. This rule would be inconsistent with the aforementioned Louisiana statutes which allow the bank to set-off a debtor's

funds where it has no notice of a third party's interest in those funds.

The "legal rule" is most consistent with pre-Article 9 Louisiana law. First, under La.R.S. 6:317 and *Shreveport Production,* the bank may typically rely on the depositor's ownership of funds in the account. As noted above, the exception to this rule is where the bank is notified by the debtor that the debtor does not have ownership of the funds. This is analogous to the Virginia common law rule followed by the court in *National Acceptance,* supra.

Second, Louisiana courts have determined, as courts have in other jurisdictions, that a bank that is aware of the trust character of funds in the debtor's account may not set-off. *Merchants & Farmers Bank & Trust Co. v. Hammond Motors Co.,* 164 La. 57, 113 So. 763 (1927); *State v. Calcasieu Nat. Bank,* 132 La. 879, 61 So. 857 (1912). The holding in *Calcasieu National Bank,* despite its antiquity, mirrors the language in La.R.S. 6:317 and *Shreveport Production:*

> [A] bank [is] entitled, *at least in the absence of knowledge to the contrary,* to presume that a depositor who presents a check in proper form is acting in the course of a lawful exercise of his rights
>
> . . .
>
> In the case of trust funds the bank assumes no responsibility *unless in some way it is put on notice of a violation of the trust.*

(emphasis added, citations omitted). In addition, Civil Code article 1899 provides that the mutual extinguishing of obligations, such as set-off, "can neither take place nor may it be renounced to the prejudice of rights previously acquired by third parties."

Courts in other jurisdictions have applied these trust law principles in priority disputes between a bank and a proceeds-secured creditor where the bank is aware of the creditor's security interest in proceeds. *See, e.g., Brown & Williamson Tobacco Corp. v. First National,* 504 F.2d 998, 1001–02 (7th Cir.1974) (Illinois law); *Universal C.I.T. Credit Corp. v. Farmers Bank,* 358 F.Supp. 317, 325 (E.D.Mo.1973) (Missouri law). The priority of the proceeds-secured creditor over a bank's right of set-off under Article 9 of the UCC can be traced to these well-settled trust law principles. *See* Barnes, 51 U.Pitt.L.Rev. at 297–99 (explaining and criticizing this progression).

### 4. Chrysler's Motion to Strike Portions of Whitney's Memos

Chrysler contends that Whitney has advanced positions in its memoranda concerning the pending motions that are inconsistent with Whitney's responses to Chrysler's Requests for Admission Nos. 16 [10], 18 [11], 21 [12], 22 [13] and 38 [14].

The Court has held that statements in Requests for Admission Nos. 16 and 18 are correct as a matter of law. However, the fact that Chrysler has a first priority security interest in the proceeds does not necessarily mean that Chrysler's interest in the proceeds has priority over Whitney's interest in the TOJ account or Whitney's right of setoff. While conceding the existence Chrysler's security interest, Whitney may contest its legal implications.

**10.** "Credit advances made by Chrysler Credit to TOJ to finance TOJ's wholesale inventory purchases of new Toyota automobiles were secured under the Collateral Chattel Mortgage by TOJ's new and used motor vehicle inventory and the proceeds derived from inventory sales."

**11.** "Under the Collateral Chattel Mortgage, Chrysler Credit had a first priority security interest in TOJ's new and used motor vehicle inventory and in the proceeds derived from inventory sales."

**12.** "Under the Floor Plan Agreement, TOJ agreed to hold in trust for Chrysler Credit's benefit the proceeds derived from inventory sales."

**13.** "Under the Floor Plan Agreement, TOJ agreed to remit proceeds derived from inventory sales promptly to Chrysler Credit."

**14.** "During the period beginning on or about February 28, 1989 and ending on or about September 28, 1990, Whitney knew that TOJ's new motor vehicle inventory purchases were being financed by Chrysler Credit on a secured floor plan basis."

The statements in Requests for Admission Nos. 21–22 merely state what TOJ agreed to do under the Floor Plan Agreement. As Whitney points out, it may still contest the legal effect of TOJ's agreement to perform these acts.

The statement in Request for Admission No. 38 relates to a material fact in this litigation, and is established conclusively. Thus, the fact that Whitney knew that TOJ's new motor vehicle inventory purchases were being financed by Chrysler Credit on a secured floor plan basis cannot be contested. Although quite probative, this fact is not conclusive as to whether Whitney knew that Chrysler had a security interest in the proceeds of the collateral. Consequently, Whitney may still contest the important (if not decisive) issue of notice of Chrysler's security interest.

### 5. Conclusion

Chrysler had a security interest in the proceeds of TOJ's new car sales and Whitney had a less senior security interest, and right of set-off, in TOJ's Whitney account. Louisiana law provides that a bank may set-off a debtor's account unless it has notice of a third party's interest in those funds. Where the bank does have notice of the security interest of a proceeds-secured creditor in those funds, it is unclear under Louisiana law which interest in the funds has priority. Under the "legal rule," the pre-UCC priority rule most consistent with Louisiana law, the proceeds-secured creditor has priority over the bank's right to set-off if the bank has notice of the security interest in the proceeds. Accordingly, Chrysler's security interest in the proceeds has priority over Whitney's right of set-off if Whitney had notice of Chrysler's security interest.

### B. Tracing of Funds

■ Even if Chrysler can establish that its interest in the proceeds was superior to Whitney's interest in the account, Chrysler must establish that it is entitled to have the proceeds, which were commingled with other funds in the TOJ account, traced and identified. Whitney contends that Chrysler

waived its rights in the proceeds by failing to require TOJ to segregate the proceeds from the sales of new vehicles. Whitney contends that Chrysler cannot be deemed to have "ownership" of the proceeds where it does not require TOJ to segregate them from other funds. Indeed, the Security Agreement empowered Chrysler to require TOJ to deposit the proceeds from the sale of collateral into a separate account, but Chrysler never required TOJ to do so.

The agreement between Chrysler and TOJ provides, in pertinent part that

> If the mortgagor so sells any one or more of such chattels, the proceeds of such sale, and the evidence thereof in whatever form the same may be, shall be the property of the Mortgagee and shall be held in trust by the Mortgagor for the use and benefit of the Mortgagee and the Mortgagor agrees as such trustee to deliver such proceeds and such evidence of sale immediately upon his or its receipt thereof to the Mortgagee, to be applied by it toward the reduction of the indebtedness incurred by this Mortgage.

Collateral Chattel Mortgage, Additional Covenant No. 3. Thus, the Chrysler/TOJ contract expressly states that the proceeds are the property of Chrysler, are to be held in trust by the dealership for Chrysler, and are to be transferred to Chrysler immediately after the sale of the collateral. However, it does not require TOJ to segregate the proceeds from other TOJ funds.

### 1. Validity of Chrysler's Security Interest in Commingled Funds

This failure to require the segregation of funds is not fatal to Chrysler's security interest. La.R.S. 9:5387(D) provides that a security interest in proceeds remains valid where the proceeds have been commingled with other funds:

> A mortgage shall not be deemed to be invalid, ineffective, or fraudulent against other creditors by reason of the mortgagor's freedom to use, commingle, or dispose of such proceeds, or by reason of the mortgagee's failure to require the mortgagor to account therefore.

Consequently, the fact that TOJ was free to, and did, commingle the proceeds of the sale of the collateral with other funds, does not affect the validity of Chrysler's interest in the proceeds.

### 2. Possessory Rights in Commingled Funds

■ Although Chrysler's security interest was valid, it does not necessarily follow that this interest constituted a "right of possession" of the proceeds.

Chrysler contends that, despite its failure to require TOJ to segregate the proceeds, it had a sufficient possessory interest in the proceeds to maintain a conversion action. Chrysler relies on *Chrysler Credit Corp. v. Perry Chrysler Plymouth*, 783 F.2d 480 (5th Cir.1986) (Louisiana law). The *Perry* case, like the case at bar, involved a claim of Chrysler Credit for the conversion of the proceeds of the sale of collateral. The contract between Perry Chrysler and Chrysler Credit required Perry Chrysler to keep all proceeds from the sale of the vehicles covered by the floor plan mortgage "separate from [its] other funds, held in trust for Chrysler Credit, and transferred immediately to it." *Id.* at 484. Instead of transferring the proceeds to Chrysler Credit as required by the contract, Mr. Perry took the money to Las Vegas and lost. Relying on Louisiana trust law,[15] the court held that the agreement between Perry Chrysler and Chrysler Credit created a fiduciary duty on the dealership's part, and that the dealership's "failure to segregate and remit the funds and its diversion of them to its own uses constituted a conversion for which it is liable." *Id.*

Whitney contends that, under *Unimobil 84, Inc. v. Spurney*, 797 F.2d 214 (5th Cir.1986), a creditor does not have the right to possess proceeds where the debtor is not required to segregate them. In that case, the plaintiff, Unimobil, contracted with the organizers of the 1984 World's Fair (Louisiana World Exposition, Inc.; "LWE") to construct and operate a monorail at the

Fair. The agreement between Unimobil and LWE provided that:

> Fifteen percent (15%) of the Gross Admission Revenue ... shall be collected and held by the Exposition as trustee in trust for the fulfillment of its obligations ... [and such funds] shall not be deemed part of the general assets of the Exposition.

Instead of holding 15% of the monorail revenue in trust for Unimobil, LWE used the funds to pay other debts. LWE filed for bankruptcy, and Unimobil was not paid the funds it was due.

The court distinguished *Perry*, and held that Unimobil did not "own" the monorail revenue for purposes of its conversion claim. The court reasoned as follows:

> [T]he language in the two contracts is materially different. Chrysler Credit's contract with the dealer quoted above—unlike Unimobil's contract with LWE—provided explicitly that the proceeds of the sales belonged to Chrysler Credit and required the dealer to immediately transmit these funds to Chrysler Credit. On these facts we held that the proceeds of the automobile sales belonged to Chrysler Credit. On the other hand, the Unimobil contract did not require LWE to segregate the gate receipts LWE agreed to withhold; neither did the contract require LWE to immediately remit these receipts. Although the contract did provide that 15% of the gate would not "be deemed part of the assets of LWE," this provision standing alone is insufficient to vest ownership of the funds in Unimobil.

*Id.* at 216. Whitney interprets *Unimobil* and *Perry* as holding that the creditor must require the proceeds to be segregated in order to maintain a conversion action. Chrysler interprets the cases as holding only that the inventory creditor must insist that the proceeds are to be held in trust by the dealer for the inventory creditor, and are to be transferred to the inventory creditor upon sale of the collateral.

---

**15.** The court cited *Canal–Commercial T & S Bank v. N.O.T. & M. Ry. Co.*, 161 La. 1051, 109 So. 834, 839 (1926).

The reality is that the holdings of *Unimobil* and *Perry* are not dispositive of this case. It is not clear, under *Unimobil*, whether a creditor who fails to require the proceeds to be segregated, but otherwise has sufficient possessory rights in the proceeds, may maintain a conversion action. Unlike the Chrysler/TOJ contract, Unimobil's contract with LWE did not establish that the monorail proceeds were Unimobil's property or require LWE to remit the monorail proceeds to Unimobil. Thus, even if Unimobil had required LWE to segregate the monorail proceeds, its security interest still would have been insufficient for it to maintain a conversion action. In this case, Chrysler's possessory rights are comparable to those of Chrysler Credit in *Perry*, except that Chrysler did not require TOJ to segregate the proceeds. To determine whether a creditor who otherwise has sufficient possessory rights in proceeds, but fails to require the proceeds to be segregated, can maintain a conversion action, the Court must look beyond *Unimobil* and *Perry*.

As Whitney points out, the general rule is that one cannot maintain a conversion claim for cash when it is not required to be segregated from other funds. In *Matter of Banister*, 737 F.2d 225 (2d Cir.1984), the Second Circuit, applying New York law, held that an inventory creditor did not "own" the proceeds of the inventory where the dealer did not have a duty to segregate the proceeds from other funds. *Id.* at 227. *Accord In re Littleton*, 106 B.R. 632, 635 (Bankr. 9th Cir.1989) (California law); *Covington v. Exxon Co., U.S.A.*, 551 So.2d 935 (Ala.1989); *Independence Discount Corp. v. Bressner*, 47 A.D.2d 756, 365 N.Y.S.2d 44 (1975).

However, in cases involving priority disputes between inventory secured creditors and banks exercising a right of set-off, the Courts have fashioned an exception to this rule:

> [C]ourts have ... with virtual unanimity, ... held that, in certain special circumstances, a secured party may trace "identifiable proceeds" through a commingled bank account and into the hands of a recipient who lacks the right to keep them.

*Harley–Davidson*, 897 F.2d at 619–620 (citations omitted). In determining when to trace proceeds, courts have "distinguished between persons who take funds from a commingled account 'in the ordinary course' of a debtor's business (where tracing and recovery are not appropriate), and recipients who have engaged in 'fraudulent' or 'collusive' or otherwise unfair behavior (where tracing and recovery are appropriate)." *Id.* at 620.

Thus, Chrysler's security interest, even if superior to Whitney's, does not automatically entitle Chrysler to the tracing remedy. Chrysler must establish that Whitney engaged in fraudulent, collusive or otherwise unfair behavior. If Whitney can establish that Whitney set off TOJ's accounts in the ordinary course of its business, Chrysler's conversion claim will fail because of Chrysler's failure to require TOJ to segregate the proceeds.

## IV. MISUSE INCONSISTENT WITH OWNER'S RIGHTS

While the parties have extensively briefed the issue of possession, they have largely ignored the other two elements of conversion: that the misuse of the funds be inconsistent with the plaintiff's ownership rights, and that the misuse was a wrongful taking. *Perry*, 783 F.2d at 484.

In determining whether the interference with another's property is sufficiently serious to give rise to a conversion action, factors to consider include:

> The extent and duration of the defendant's exercise of control over the [property], his intent to assert a right which is in fact inconsistent with the plaintiff's right of control, the defendant's good faith or bad faith, the extent and duration of the resulting interference with the plaintiff's right of control, the harm done to the [property], and the expense and inconvenience caused to the plaintiff.

*La. State Bar Ass'n v. Hinrichs*, 486 So.2d 116, 120–21 (La.1986).

If Chrysler can establish the first element of conversion (its ownership rights), it

appears that it can easily establish the second element of conversion, that Whitney's action was "inconsistent with its rights of ownership" in the proceeds. *Perry*, 783 F.2d at 484. Whitney's action in setting off TOJ's account permanently denied Chrysler access to the proceeds which had been deposited into the TOJ account with Whitney. Assuming, *pro arguendo*,[16] that Chrysler did have possessory rights to the proceeds at the time of Whitney's setoff, Whitney's actions were inconsistent with these possessory rights.

## V. "WRONGFUL" TAKING

In order for an act to give rise to a conversion claim, the act of taking must be "wrongful." There are two ways that a taking can be "wrongful." The first is where the defendant initially acquires the property by a wrongful act, such as theft or fraud. The second is where the defendant comes "rightfully into possession and then wrongfully refuse[s] to surrender" the property to one who is entitled to it. *Hinrichs*, 486 So.2d at 121. In the second scenario, "demand and refusal are necessary to the existence of the tort." *Id.* When demand is made, "an absolute, unqualified refusal to surrender, which puts the plaintiff to the necessity of force or a lawsuit to recover his own property, is of course a conversion." *Id.*

In this case, Chrysler must establish that (1) Whitney initially obtained the funds by a wrongful act, or (2) Chrysler made a demand to Whitney for the proceeds and Whitney refused to release them to Chrysler. Since this issue has not been briefed by the parties, the Court will refrain from considering it at this time.

## VI. CONSENT

It is well-settled, under Louisiana law, that a lack of consent by the owner or possessor is a prerequisite to a conversion action. *U.S. v. Hibernia Nat. Bank*, 882 F.2d 961, 966 (5th Cir.1989). Whitney contends that Chrysler was well aware of

Whitney's practice of covering TOJ's checks, and that Chrysler knew that the proceeds of the sale of its collateral was being used to pay back Whitney's loans to TOJ.

Whether Chrysler, through its conduct, consented to the alleged conversion by Whitney is a question of fact concerning Chrysler's state of mind, and is best reserved for resolution at trial.

## VII. SUBROGATION

To the extent that Chrysler has a higher priority security interest to Whitney's, Whitney contends that it is subrogated to Chrysler's position because Whitney covered TOJ's overdrafts to enable TOJ to pay Chrysler. Whitney cites La.Civ.Code Ann. art. 1829(1), which provides that "[s]ubrogation takes place by operation of law ... [i]n favor of an obligee who pays another obligee whose right is preferred to his because of a privilege, pledge, or mortgage."

There is little question that Whitney was an "obligee" of TOJ's by virtue of its loans to TOJ. However, it is questionable whether Whitney "paid" Chrysler the money owed by TOJ. A more accurate description of the arrangement would be that Whitney made loans (by covering the overdrafts) to TOJ to enable TOJ to pay off some of its debt to Chrysler.

The Court need not consider Whitney's subrogation defense, because the issue is moot. Even if Whitney was Chrysler's subrogor, Whitney could only set-off TOJ's funds to the extent of Whitney's performance rendered to Chrysler. La.Civ.Code Ann. art. 1830. In its conversion action, Chrysler, of course, may only recover the proceeds that it did *not* receive (from TOJ or Whitney). Thus, in claiming to be Chrysler's subrogor, Whitney is attempting to shield itself from liability that it cannot incur.

## VIII. CONCLUSION

 Because there are genuine issues of fact to be tried, as described above,

---

**16.** As noted above, the priority between Chrysler's interest in the proceeds and Whitney's right of setoff rests on disputed questions of fact.

Whether Chrysler has a possessory interest, for purposes of its conversion claim, is dependent upon the resolution of these questions.

which preclude summary judgment for either Chrysler or Whitney on Chrysler's conversion claim,

IT IS ORDERED that Chrysler's Motion for Summary Judgment and Whitney's Cross–Motion for Summary Judgment are hereby DENIED;

IT IS FURTHER ORDERED that Chrysler's Motion to Strike Exhibits is DENIED and Chrysler's Motion to Strike Portions of Whitney's Motion Papers is DENIED as MOOT.