**Dr. Carl BERNOFSKY**

v.

**TULANE UNIVERSITY MEDICAL SCHOOL**

**Civil Action No. 95–358.**

United States District Court,
E.D. Louisiana.

April 15, 1997.

Roger Dale Phipps, Phipps & Phipps, New Orleans, LA, for plaintiff.

Julie Durel Livaudais, George Philip Shuler, III, Desha D. Dardenne, Chaffe, McCall, Phillips, Toler & Sarpy, LLP, New Orleans, LA, for defendant.

## ORDER AND REASONS

BERRIGAN, District Judge.

This matter comes before the Court on motion for summary judgment filed by the defendant, The Administrators of the Tulane Educational Fund ("Tulane"). Having considered the record, the memoranda of counsel and the law, the Court has determined that the motion should be granted for the following reasons.

The plaintiff, Carl Bernofsky, Ph.D. ("Bernofsky"), is a Jewish male who worked in the Biochemistry Department at Tulane's School of Medicine between 1975 and 1995, when he was terminated at the age of 61. Bernofsky filed this suit for race discrimination under 42 U.S.C. § 1981 and age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA") and La.Rev.Stat. 23:972, et seq. He has also alleged state law claims for breach of contract, detrimental reliance under La. Civ. Code art.1967, conversion under La. Civ. Code art. 2315, retaliation for environmental reporting under La.Rev.Stat. 30:2027B, and wanton and/or reckless disregard relating to the storage, handling and transportation of hazardous material under La. Civ.Code art. 2315.3.

According to Bernofsky, at some time in 1977, he was told by the then Department chairman, Rune Stjernholm, Ph.D. ("Stjernholm"), that his position would be converted to a tenured position at Tulane upon the retirement of several tenured members of the department. The primary focus of the discrimination claims is James Karam, Ph.D. ("Karam"), who became Chairman of the Biochemistry Department at Tulane in November 1991 and who, according to Bernofsky, has a hatred for older Jewish professors whom he cannot control. Bernofsky claims that he requested tenure from Karam, was refused and that Karam harassed and interfered with him. Bernofsky claims that this interference in turn led to his inability to

obtain grant funding and ultimate termination.

## UNDISPUTED FACTS

Many of the material facts are undisputed. Bernofsky first joined the faculty in the Biochemistry Department in 1975 as a Visiting Associate Professor. In 1981, he was appointed as Research Associate Professor, and in 1983 he was named Research Professor. Bernofsky received written yearly appointments throughout his career at Tulane. He admitted in his deposition that he was advised when hired that his salary was to be paid out of research grants generated by him.

Under Tulane's rules in effect in 1975, Bernofsky's appointment was considered "special, does not provide tenure and is not regarded as probationary toward tenure." (Rec.Doc. 63, Exh. 29, p. 26). Those rules also provided that Tulane can convert a special appointment into a "regular" appointment, which can lead to permanent tenure. (Rec.Doc. 63, Exh. 29, p. 26).

Tulane's 1986 Faculty Handbook provides that the decision to terminate or convert a full time faculty appointment must be made within the first seven years of full time special service at Tulane. With regard to the Medical School's Research Associate Professor position, the handbook provides:

In view of the practices prevailing at many medical centers, the School of Medicine .... may continue to use the academic ranks in the titles designated for faculty members primarily engaged in research, e.g. Research Associate Professor. Service in such positions cannot lead to tenure. However, conversion from such a position to a regular full-time faculty appointment or vice versa, may be made, but only once and only within the first seven years of full-time service ...

(Rec.Doc. 55, Exh. A, p. 7). Tulane's rules also provided that:

The conditions of each appointment, including salary, rank, term of appointment, and tenure, shall be stated and confirmed to the faculty member in writing by the dean of the school or college. Any subsequent extensions or modifications of an appointment, and any special understandings, shall be stated and confirmed in writing by the dean of the school or college. (Rec.Doc. 55, Exh. A, pp. 6–7).

The School of Medicine's Policy Statement defined these research faculty appointments as follows:

Faculty primarily engaged in research may receive the usual rank of Instructor, Assistant Professor, Associate Professor of Professor with the prefix RESEARCH added to their title. These individuals may be appointed in a full-time non-tenure track position in both the basic and clinical science departments. These individuals are hired for research positions and do minimal teaching (e.g. 95% of their effort is devoted to research). (sic) and they are usually paid completely from research grants. The continuation of their annual appointment depends upon the availability of funds from extramural research grants. Research faculty are reviewed annually for their research productivity ... Depending upon the availability of research grant support, research track faculty should be given at least 6 months advance notice before termination.

(Rec.Doc. 55, Exh. B, p. 9).

Shortly after Karam took over the department in 1991, Bernofsky asked for tenure from Karam. The evidence reveals that in September 1993, Karam asked Dean James J. Corrigan, M.D. ("Corrigan") about Bernofsky's eligibility for tenure, and received the reply that he was not eligible for tenure or tenure track conversion under the above provisions. (Rec.Doc. 55, Exh. M). Bernofsky was formally advised of his ineligibility in May 1994 and again in August 1994. (Rec. Doc. 55, Exhs. E & O).

It is also undisputed that Bernofsky's grant funds for the years 1990–1995 fell far short of meeting his salary needs. The deficit was met with departmental funds. (Rec. Doc. 55, Exhs.U, V).

In March 1994, Bernofsky's performance was evaluated by a Faculty Review Committee consisting of Stjernholm, Yu–Teh Li, Ph.D. and Richard H. Steele, Ph.D. The May 1994 evaluation indicated a lack of success in

obtaining research grants, a problem with the quality and quantity of research and publication, a lack of teaching duties and participation with others in the department. (Rec.Doc. 55, Exh. D). Karam recommended to Corrigan that Bernofsky's appointment for academic year 1994–1995 be renewed on condition that included undertaking teaching responsibilities in light of his lack of extramural research grant funding. (Rec.Doc. 55, Exh. E). It is undisputed that Bernofsky did not agree to teach.

On August 9, 1994, Bernofsky received a six-month written notice of termination unless he could obtain research grant funding to support his salary. Such funding was not received. Tulane's deadline was extended to February 1995, at which time this suit was filed. Bernofsky was eventually terminated effective April 21, 1995. He filed a complaint with the EEOC after suit was filed.

The Court's analysis of all the plaintiff's discrimination claims begins with appropriate recognition of certain other undisputed facts. First, Bernofsky admits in his deposition that he has no evidence of race-based discrimination against him before the arrival of Karam as department head.[1] (Depo.Bernofsky, Rec. Doc. 55, Exh. C, Vol.II, pp. 29–31). He also admits in deposition that Karam was not "after" younger Jewish professors. (Rec. Doc. 55, Exh. C, Vol.II, p. 63). Also significant is the undisputed fact that Bernofsky admitted both that he was told when he was

hired that his salary would be paid out of research grants and that he did not generate enough research funds to pay his salary in the years immediately preceding his termination. (Rec. Doc. 55, Exh. C, Vol. I, pp. 66, 206; Rec. Doc. 55, Exh. U). Finally, Bernofsky received written annual appointments every year he was at Tulane.

## DISCRIMINATION CLAIMS

Where the defendant has demonstrated the absence of a genuine issue of material fact, the plaintiff must go beyond the pleadings and designate specific facts showing the existence of a genuine issue of material fact for trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994). Actual factual controversy is resolved in favor of the plaintiff, but no presumption is made that the plaintiff will prove necessary facts. *Id.* Metaphysical doubt, conclusory allegations, unsubstantiated assertions or a mere scintilla of evidence are not sufficient. *Id.*

The parties agree that the basic elements of a cause of action for intentional discrimination under 42 U.S.C. § 1981, the ADEA and La.Rev.Stat. 23:972 mirror those applicable in Title VII cases. *Woodhouse v. Magnolia Hospital*, 92 F.3d 248 (5th Cir.1996); *Wallace v. Texas Tech University*, 80 F.3d 1042 (5th Cir.1996); *Deloach v. Delchamps, Inc.*, 897 F.2d 815 (5th Cir.1990). The applicable three-tier analysis first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) sets

---

1. The facts that Karam is 58 years old and of Lebanese ethnic background are deemed material. (Rec. Doc. 1, ¶ 20; PTO, Rec. Doc. 114, p. 13). The defendant claims as relevant the undisputed fact that Karam is married to a Jewish woman. The plaintiff claims that this fact is not significant because:

   All too often those who would discriminate against persons of a particular race only take aim at those persons who are their equals.

   In the case at hand, all of the senior Jewish Professors in the Biochemistry Department have been treated unfavorably by Dr. Karam in varying degrees. These three senior faculty members are his professional equals and function essentially independent of him, In contrast, Dr. Hyman, the recently hired faculty member is dependent on Dr. Karam for departmental resources and thus poses no challenge to him. Similarly, Dr. Karam's wife, who is primarily a housewife, also is in a dependent relationship. (Rec.Doc. 11, p. 11–12).

   Similarly, counsel for the plaintiff has argued for the relevancy of discovery into the parentage of Karam's secretary, Carol Ulrich ("Ulrich"). He explained at her deposition:

   I believe that you come from a German background and I would like to investigate to find out whether or not there is any connection between the German state during the '40's and the '30's and the animus that I believe that you have toward Dr. Bernofsky. Now, I am going to go on.

   I am going to have to find out what your parents' parents' names were. I would like to find out what their name is because I am concerned that they may be immigrants to this country. If they are, immigrants to this country, it is possible that they were survivors in Germany and they bare an animus towards (sic) Jew and that is what has brought you to the present situation where we finds ourselves today. (Depo.Ulrich, Rec.Doc. 55, Exh. L, pp. 18–21).

forth the following framework: (1) the plaintiff must establish a prima facie case of employment discrimination; (2) the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and (3) the burden returns to the plaintiff to prove that the reason was a pretext for discrimination and that the real reason was to discriminate. *Polanco v. City of Austin, Tex.*, 78 F.3d 968 (5th Cir.1996).

Once the plaintiff establishes the prima facie case by a preponderance of the evidence, the prima facie case raises an inference of unlawful discrimination. Of course, direct evidence of discriminatory motive can also establish a prima facie case. *Wallace, supra.*

The burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action. This burden is met with evidence that if believed would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets its burden, the presumption disappears and the prima facie case disappears. However, the plaintiff is allowed an opportunity to demonstrate that the defendant's articulated rationale is merely a pretext for discrimination. Such evidence of pretext will allow a fact finder to infer that the discrimination was intentional. *Id.*

In the end, to sustain a finding of discrimination, circumstantial evidence must allow a rational fact finder to make a reasonable inference that race or age was a determinative reason for the employment decision. At all times, the plaintiff retains the burden of persuading the fact finder that impermissible discrimination motivated the adverse employment decision. *Stults v. Conoco, Inc.* 76 F.3d 651 (5th Cir.1996).

A plaintiff can avoid summary judgment if the evidence, taken as a whole creates a fact issue as to whether the employer's stated reasons was not the motivation for the action or creates a reasonable inference that race or age was a determinative factor in the employment action. *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989 (5th Cir.1996) (en banc); *Grimes v. Texas Dept. of Mental Health & Mental Retardation*, 102 F.3d 137 (5th Cir. 1996). The plaintiff must present evidence sufficient to create a reasonable inference of discriminatory intent. *Id.; LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444 (5th Cir.1996).

Here, the plaintiff's discrimination claim has changed over time. When this motion was filed, the plaintiff argued and testified that he was discriminated on the combined bases of his race and age.[2] Specifically, Bernofsky argued that Tulane discriminated against him based on his status as an "older non-tenured Jewish professor."[3]

Subsequent to the filing of papers in conjunction with this motion but prior to the first trial setting, Bernofsky abandoned the subgroup of older Jewish professors in favor of independent theories of race[4] and age discrimination.[5] (Rec.Doc. 119). The Court

---

**2.** Tulane concedes that Bernofsky is both Jewish and over 40 years old.

**3.** The Court could not locate any authority for recognition of "older Jews" as a subgroup protected by § 1981 and the ADEA. However, the Court's research revealed a compelling support for nonrecognition of such an "age-plus" subgroup. The Fifth Circuit has recognized "sex-plus" discrimination within the confines of Title VII. *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971); *Jefferies v. Harris County Community Action Assn.*, 615 F.2d 1025 (5th Cir.1980). *See also: Lam v. University of Hawaii*, 40 F.3d 1551 (9th Cir.1994). However, no case has recognized the subgroup of older Jews or combined claims brought under § 1981 and the ADEA, and the caselaw does not lend its support to such recognition. *Luce v. Dalton*, 166 F.R.D. (S.D.Cal.1996). Even assuming the existence of the protected subgroup of

"older Jews," Bernofsky cannot prove his claims of discrimination for the same underlying reasons that plague his current claims.

**4.** Section 1981 protects against only race discrimination. Specifically, Section 1981 provides in pertinent part as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ...

**5.** The ADEA, 29 U.S.C. § 623, protects against only age discrimination and provides in relevant part as follows:

It shall be unlawful for an employer —

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any

permitted the change in claims despite their timing and the prejudice to Tulane. However, the Court ordered that the trial be continued and that a new and revised pre-trial order be submitted which reflects the precise claims that are being made prior to ruling on this motion. It is these claims listed in the pre-trial order which the Court is considering on this motion.[6] (PTO; Rec. Doc. 114, pp. 2–7).

In his original opposition, Bernofsky specifies his discrimination claims "with respect to his denial of tenure, retaliation against him as a result of his request that his name be recommended for conversion with an immediate appointment of tenure, and his discharge." (Rec.Doc. 63, p. 14). In the pre-trial order, he claims that his § 1981 claims are based on failure to promote/denial of tenure, retaliation/harassment/interference during employment and discharge. He claims that his ADEA claims are for retaliatory discharge and discriminatory discharge. (Rec.Doc. 114, p. 2). Tulane denies these allegations in the pre-trial order and contends in this motion that Bernofsky is unable to make a prima facie case of racial or age discrimination because he cannot present proof that he was qualified or that he received less favorable treatment than a similarly qualified person outside of the protected class. Tulane further argues that Bernofsky's termination was based on legitimate and nondiscriminatory reasons which are not pretextual. Specifically, Tulane argues that Bernofsky was not qualified for tenure and was not qualified as a Research Professor due to his inability to obtain sufficient grant funding.[7] The Court agrees.

■ The plaintiff's § 1981 claims immediately face some formidable procedural problems. The right to make contracts under § 1981 does not protect the employee from any conduct by the employer after the contractual relationship has begun; the right to enforce contracts under § 1981 involves the right of access to legal process. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Carter v. South Central Bell*, 912 F.2d 832 (5th Cir.1990), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). The Supreme Court has specifically held that § 1981 does not recognize claims for racial harassment.[8] *Patterson, supra*. With regard to Bernofsky's discriminatory discharge claim, Section 1981 does not extend to discriminatory discharge claims or retaliatory discharge claims. *Carter, supra*. However, even assuming that these procedural bars do not exist, the plaintiff faces equally serious problems with the undisputed facts.

### Denial of Tenure

■ Assuming Bernofsky's § 1981 claim for the denial of tenure is procedurally viable, in order to establish a prima facie case of discrimination for failure to promote, the plaintiff must show: (1) that he is a member of a protected class; (2) that he sought and was qualified for an available employment position; (3) that he was rejected for that position; and (4) that the employer continued to seek applicants with the plaintiff's qualifications. *Grimes, supra*.

Here, the undisputed facts indicate that Tulane's policy handbook provides that conversion to tenure track must occur within the first seven years of full time employment at Tulane and the Bernofsky did not meet this requirement in 1989, when he claims that

---

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . .

**6.** The Court is compelled to note that after painstaking effort, it is unable to locate sufficient factual support for much of the enormous volume of material factual allegations contained in his oppositions and in the pre-trial order, especially in the plaintiff's lengthy appendix to his brief summary of material facts located at the end of the pre-trial order. The plaintiff's difficul-

ties with the facts contribute to many of the deficiencies the Court finds in his claims.

**7.** The Court does not address Tulane's arguments that Bernofsky did not adequately publish and was not collegial.

**8.** The elements for a claim under § 1981 for retaliation were the same, when such a cause of action was recognized prior to *Patterson, supra*. See: *Goff v. Continental Oil Co.*, 678 F.2d 593 (5th Cir.1982).

Stjernholm promised[9] him that he would be tenured or after Karam became Chairman of the Biochemistry Department in 1991. Despite Bernofsky's suggestions to the contrary, he simply does not have any proof to support his assumption that a single person could promise or award tenure at Tulane, nor does he have written proof that tenure was promised to him by any person or persons at Tulane with appropriate authority to make that promise. The mere fact that Karam was of Lebanese lineage and the plaintiff Jewish is insufficient proof of discriminatory intent.

Instead, Bernofsky's proof of discrimination in denial of tenure surrounds the fact that another professor, Jen–Sie Tou, Ph.D. ("Tou"), was converted to a tenured position despite the written requirements in 1989, *before* Karam became chairman. Essentially, the plaintiff argues that if an exception to Tulane's requirements had been made for Tou in 1989, an exception should have been made for Bernofsky and therefore that the failure to do so must have been racial discrimination. He also argues that he should have been told that Stjernholm recommended that he be considered for tenure at the same time as Tou in 1989 and that tenure was wrongfully withheld because he was not so informed. Assuming that Bernofsky was otherwise qualified for an "exception" and could make a prima facie case, the Court finds that Tulane has presented undisputed proof that unlawful discrimination was not the cause of the granting the exception to Tou and not Bernofsky. It is undisputed that Tou had previously served as a tenure-track professor from 1972 to 1980 at which time her appointment was converted to a research professorship. Tou's situation is distinguishable because she was on a tenure track for a number of years prior to her conversion. Bernofsky was never on a tenure track. Of course, Karam was not at Tulane until 1991 and the plaintiff admits that he lacks any evidence of discrimination at the time Tou was converted and Bernof-

sky was not. To establish pretext, the plaintiff must show that the proffered reason was false and that unlawful discrimination was the real reason. *Barrow*, 10 F.3d at 298, fn. 22. Here, Bernofsky cannot show that he was qualified for tenure and can offer nothing that suggests that Tulane's failure to make an "exception" for him was discriminatorily motivated or that Tulane's rationale is merely a pretext for discrimination.

Bernofsky also argues that he was already tenured under the terms of his contract with Tulane, although this argument ignores his subsequent alleged repeated requests to be considered for tenure. He also argues that he had been told by Karam that he had "de facto tenure." Assuming this comment was made, the undisputed facts still clearly establish that "de facto tenure" does not exist at Tulane, Bernofsky knew that "de facto tenure" did not exist and kept asking for "real" tenure and that Karam did not promise Bernofsky that he would receive "real" tenure. Rather, the undisputed facts indicate that Karam responded to Bernofsky's requests for tenure with written inquiry, was advised that Bernofsky was not eligible for tenure and so advised the plaintiff. In sum, while Bernofsky's claims involving tenure rely on conflicting versions of fact, all those facts and their attendant conflict have been supplied by Bernofsky alone. Therefore, the plaintiff is left with insufficient proof either that he had tenure or that he was discriminatorily denied tenure at Tulane.

### Retaliation, Harassment, Interference and Retaliatory Discharge

In order to establish a prima facie claim for retaliation, the plaintiff must establish: (1) the plaintiff engaged in protected activity; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the projected activity and the adverse employment action. *Holt v. JTM Industries, Inc.* 89 F.3d 1224 (5th Cir.1996). An employee has engaged in protected activity if he has either

---

**9.** The Court notes that Bernofsky alternatively characterizes Stjernholm's statements as a "promise" and a "recommendation." Of course, the difference in the characterization could be critical to his entitlement, but is of no moment here given Bernofsky's understanding of how tenure is given at Tulane and the fact that Bernofsky is unable to present proof that Stjernholm's promise or recommendation could have resulted in the actual grant of tenure.

(1) opposed any practice made an unlawful employment practice or (2) made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the statute. *Grimes, supra; Long v. Eastfield College,* 88 F.3d 300 (5th Cir.1996). The plaintiff must show that he had at least a reasonable belief that the opposed practices were unlawful. *Long, supra.* The elements for a claim of retaliation are the same under the ADEA and Title VII; cases under each frequently rely upon cases interpreting the other. *Holt; Barrow v. New Orleans S.S. Assn.,,* 10 F.3d 292 (5th Cir.1994).

■ Bernofsky's claim for racial discrimination under § 1981 involves alleged retaliation, harassment and interference from Karam which allegedly began, according to the pre-trial order, when Bernofsky requested from Karam the tenure allegedly "promised" by Stjernholm. The pre-trial order also indicates that Bernofsky has also made a claim for retaliatory discharge under the ADEA, apparently relying on the same facts. The plaintiff claims that his research efforts were hampered until he lost funding, and that he was evaluated in peer review improperly and discriminatorily. In the pre-trial order, Bernofsky alleges that Tulane imposed a condition that he secure grant funding as a result of the discriminatory peer review, despite the fact that he previously admitted in deposition that he understood from the beginning that his employment at Tulane required that he obtain funding. Tulane responds that Bernofsky was not eligible for tenure, that he was unable to get adequate grant funding to support his salary and that he did not take on additional departmental responsibilities to make up for the shortfall.

■ Substantial legal hurdles face the plaintiff's claims of retaliation. First, with regard to any claim under § 1981 for racial retaliation, there is no material fact among the battalion of allegations and facts recited by the plaintiff to suggest that any of the allegedly discriminatory conduct carries with it the degree of consequence required of an "adverse employment action." *Mattern v. Eastman Kodak Co.,* 104 F.3d 702 (5th Cir. 1997). In *Mattern,* the Fifth Circuit held that the definition of "adverse employment action" for retaliation claims under Title VII does not include action that has "mere tangential effect on a possible future ultimate employment decision" such as disciplinary action, reprimand, or even poor performance, or "anything which might jeopardize employment in the future." *Mattern,* 104 F.3d at 708.

In addition, it must be noted that the Fifth Circuit has recognized the necessity of peer-review evaluation techniques in the university context. *Gottlieb v. Tulane University of La.,* 809 F.2d 278 (5th Cir.1987). In any event, Bernofsky cannot present proof that any of this alleged negative treatment and peer review was discriminatorily tainted. Again, the facts that the plaintiff was Jewish and 61 satisfy one element of the prima facie case; they are insufficient to carry the entire burden on summary judgment.

While the plaintiff's ADEA claim for retaliatory discharge involves an adverse employment action, it suffers from a second defect underlying all of the claims of retaliation: the absence of "protected activity." Bernofsky chose to file a complaint with the EEOC after suit was filed. By Bernofsky's own admission, he was not shy about complaining at work. However, he cannot show that at any time he made a complaint of racial or age discrimination with Tulane or opposed any practice made an unlawful employment practice at any earlier time that could constitute qualifying protected activity.

Any action resulting from his demands for tenure from Karam also fall due to the lack of proof that: such tenure was owed Bernofsky or denied due to improper racial or age considerations. In any event, the Court finds that Bernofsky's demand for tenure as allegedly promised by Tulane does not constitute a protected activity under the undisputed facts presented. In addition, all claims for retaliation under § 1981 and the ADEA suffer for lack of causal connection between any allegedly protected activity and adverse employment action. Finally, Bernofsky cannot establish that Tulane's explanation for the challenged activity was pretextual and has not offered proof that their explanation

was false and that discrimination was the real reason. *Barrow, supra.*[10]

## Discriminatory Discharge

■ The plaintiff establishes a prima facie case of discriminatory discharge when he shows that: (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of the employment action; and (4) he was either replaced by someone outside the protected class or otherwise discharged because of his race or age. *Rhodes, supra.*[11] Again, Tulane argues that Bernofsky was not qualified because of his lack of extramural funding and that other Jewish and older persons were hired or retained in the department during Karam's chairmanship.

The plaintiff's primary proof with regard to his discharge involves the retention of Dr. Su–Chen Li ("Li"), wife of Dr. Yu–Teh Li. The plaintiff argues that Li does not have any grant funding "in her own right." (Rec. Doc. 114, p. 4). However, it is undisputed that 100% of Li's salary was paid through extramural funding between 1988–1991, and from 1991 to the present, only 25% of Li's salary is paid with departmental funds; these funds come from grants awarded to her husband. By contrast, Dr. Bernofsky acknowledges that he was paid in substantial part with departmental funds, estimated at 70% by Bernofsky himself; it is undisputed that no one else at Tulane contributed to the payment of his salary.[12] (Rec. Doc. 114, pp. 8 & 14A). It is also undisputed that Li teaches courses and participates in departmental committee activities and that Bernofsky has not taught since 1992 nor served on a committee since 1993. In fact, Bernofsky specifically rejected an identical offer by Tulane to take on teaching duties in order to remain at Tulane. Again, Bernofsky does not establish that the lack of funding was false or that unlawful discrimination caused his termination. *Barrow.*

## STATE CLAIMS[13]

### Breach of Contract and Detrimental Reliance

The first two state claims made by Bernofsky pertain to his alleged tenure and/or promise of tenure. These claims relate to the alleged promise made by Stjernholm in 1977 and Karam's alleged statement of "de facto tenure." According to the pre-trial order, Bernofsky claims both that he was in fact tenured by virtue of these alleged "promises" when he was terminated and that, although he was not tenured at the time of his termination, he detrimentally relied on the promises of Stjernholm and Karam. The conflicting nature of Bernofsky's own actions is reflected in the undisputed facts. These undisputed facts both explain why his theories of recovery are inconsistent and undermine them.

---

10. Bernofsky argues for the relevance of the comment from a tenured professor, Dr. Melanie Ehrlich, that she did not get along with Karam and that it "may well [have] a Jewish component." (Rec.Doc. 114, p. 5). The Court finds that this, along with Bernofsky's unsubstantiated impressions that other Jewish professors were also discriminatorily treated by Karam, are insufficient to avoid summary judgment.

11. In the ADEA context, the Fifth Circuit has recognized an appropriate fourth element where the employer does not plan to replace the discharged employee is whether others who were not members of the protected class remained in similar positions. *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir.1995). Also, the United States Supreme Court recently held that "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *O'Connor v. Consoli-* dated Coin Caterers Corp., —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996).

12. Bernofsky argues as relevant the fact that he paid for his research assistants from his grant funds. However, Bernofsky has made Li the focus of his argument that she was less qualified and allegedly more favorably treated by Tulane when she was retained. Bernofsky's focus and comparison is not on Li's husband. In any event, this argument does not change the undisputed fact that he did not find non-departmental funds sufficient to cover his own salary.

13. Because the issues pertaining to the viability of the state law claims have been fully briefed, the Court finds that judicial economy, convenience, fairness and comity weigh in favor of exercising jurisdiction over these remaining claims. *Metropolitan Wholesale Supply, Inc. v. M/V ROYAL RAINBOW*, 12 F.3d 58 (5th Cir. 1994).

■ Bernofsky claims support from the fact that Stjernholm unsuccessfully recommended that Bernofsky be considered for tenure in 1989. This fact recognizes the underlying truth that no one person can promise or grant tenure at Tulane and that the "promise" of the department head is insufficient in itself to grant tenure. The fact that Bernofsky alleges that he continually asked about being considered for tenure, as recently as 1994, establishes that he knew he was not tenure-track or tenured and that he knew the procedure set forth by Tulane for tenure.[14] The undisputed facts show that Bernofsky received annual written appointments, consistent with his non-tenured status in accordance with Tulane's rules, and that his continued ineligibility was confirmed by Dean Corrigan in writing in 1994.

With regard to Bernofsky's contract claim that he was tenured at the time of his termination, the undisputed fact is that Bernofsky did not receive tenure or become eligible for tenure track by the appropriate authorities at Tulane at any time. The Court unhesitantly concludes that Bernofsky has no proof that he was actually granted tenure-track status or tenure by Tulane sufficient to avoid summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[15]

■ The undisputed facts undermine Bernofsky's claim of detrimental reliance under La. Civ.Code art.1967 as well.[16] In order to establish a claim of detrimental reliance under Louisiana law, the plaintiff must prove: (1) that Tulane made a representation; (2) that Bernofsky justifiably relied on that representation; and (3) that Bernofsky changed his position to his detriment because of that reliance. *Levinson v. Charbonnet,* 977 F.2d 930 (5th Cir.1992).

With regard to the first element, Bernofsky may face a serious procedural impediment with regard to the alleged representation made by Stjernholm in 1977. As the Louisiana Supreme Court held in *Morris v. Friedman,* 663 So.2d 19 (La.1995), Article 1967 may not apply retroactively to an alleged promise made before its effective date in 1985. Again, with regard to the representation allegedly made by Karam, the Court finds that the alleged "de facto" characterization actually indicates the lack of "true" tenure.

■ In any event, Bernofsky cannot establish either that he actually relied upon either representation or that his reliance was reasonable. Again and by his own admission, Bernofsky continued to ask to be considered for tenure which undisputedly erases the possibility of genuine dispute as to his actual reliance. This fact is affirmatively established by Tulane's consistent treatment and annual written confirmation to Bernofsky of his non-tenured status.

Further, the Court finds that these undisputed facts equally undermine any genuine claim of justified reliance. Bernofsky is a highly educated man who understood and acted on the rules governing consideration for tenure. The alleged representations upon which Bernofsky allegedly justifiably relied were, at best, encouraging communications from two individuals that would be a

---

14. The Court specifically finds that any alleged written statement made by Department personnel to third parties regarding Bernofsky's possible consideration for future tenure is insufficient as a matter of law to create a genuine dispute of material fact regarding Bernofsky's contractual entitlement to tenure and cannot be reasonably relied upon in light of Bernofsky's admitted actions which so clearly indicate a very clear understanding of his employment status at Tulane.

15. Of course, the contract claim also suffers from the legal deficiency that if Bernofsky's agreement with Tulane was for a length of time beyond Tulane's written one-year commitments, it would be construed as a contract for an indefinite period of time which is terminable at the will of either party. *See: Gilbert v. Tulane University,*

909 F.2d 124 (5th Cir.1990); La. Civ.Code. art 1778.

16. Article 1967 provides:

Cause is the reason why a party obligates himself.

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

necessary prelude before one was seriously considered for tenure by the larger governing bodies at Tulane. Bernofsky's current self-serving and conflicting allegations and statements cannot rescue him from the undisputed facts that Bernofsky's consideration for tenure was, at best, restricted to such isolated remarks. The Court finds that these statements could easily be recognized for what they were and that they were, in fact, recognized as such by Bernofsky at the time they were made.

### Conversion

Conversion is an act in derogation of the plaintiff's possessory rights or any wrongful exercise or assumption of authority over another's goods, depriving him of permanent or indefinite possession. *Chrysler Credit Corp. v. Whitney National Bank*, 51 F.3d 553 (5th Cir.1995). It is the commission of a wrongful act of dominion over the property of another in denial of or inconsistent with the owner's rights. *Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1 (5th Cir.1992). In order to prevail on a claim of conversion under Louisiana law, the plaintiff must prove that (1) he owned or had the right to possess; (2) the defendant's use was inconsistent with the plaintiff's right of ownership; and (3) the defendant's use constituted a wrongful taking. *Chrysler Credit Corp. v. Whitney National Bank*, 798 F.Supp. 1234 (E.D.La.1992).

The pre-trial order does not shed light on the precise objects of Bernofsky's claim for conversion. In his first opposition to Tulane's motion, he identified "equipment and last paycheck" as the items allegedly converted by Tulane. (Rec.Doc. 63, p. 45). In that opposition, Bernofsky relies on the allegations of his complaint in support of this claim. *Id.* Tulane's specifically requested identification and proof of ownership. (Rec. Doc. 67, p. 8–9). In response, Bernofsky offers the lone testimony of Stjernholm that Bernofsky brought certain equipment with him when he began at Tulane, yet makes no statement identifying what equipment he is claiming ownership. (Rec.Doc. 70, pp. 17–19). In yet a subsequent reply memorandum, Bernofsky cites law indicating less than an ownership interest may sometimes be sufficient to support conversion, and reiterates

his general allegation that he owned unspecified equipment and has proof, although he chose not to identify and produce evidence of his ownership interest. (Rec.Doc. 104, p. 9). Bernofsky has been given ample opportunity to present the proof that *Celotex, supra,* requires of a plaintiff seeking to avoid summary judgment.

The fact that this suit had been filed at the time Bernofsky was terminated also works against Bernofsky on this claim. Counsel for Bernofsky advised the Court of his claimed entitlement to equipment at that time. Identification and proof was requested by Tulane during those early months of this lawsuit. The Court finds that this lack of proof is no accident and Bernofsky's failure to produce any proof relating to ownership is not inadvertent. Summary judgment on this issue is warranted.

### Retaliation under La.Rev.Stat. 30:2027.

Bernofsky's final two claims concern a complaint to Tulane in 1992 regarding an incident of flooding in his laboratory. In the pre-trial order, Bernofsky claims that animal hair, blood and unidentified chemicals were involved in the lab flood. He eventually filed a grievance for flood damage to his laboratory equipment with Tulane. In opposition, Bernofsky admits that his "grievance sought a resolution to a very specific problem, damaged equipment . . . however, the larger issue of flooding of waste matter . . . was a problem requiring action by Tulane's administration." (Rec.Doc. 70, p. 15). He claims that his "specific complaint seeking repair of critically necessary equipment in no way diminishes the fact that he also made a complaint about an environmental problem and was retaliated against by his employer." (Rec.Doc. 70, p. 16).

Under La.Rev.Stat. 30:2027 A:

No firm, business, private or public corporation, partnership, individual employer, federal, state, or local governmental agency shall act in a retaliatory manner against an employer, acting in good faith, who reports or complains about possible environmental violations.

The Court was unable to locate much reported caselaw on this statute. However, it finds

that Bernofsky is unable to present proof adequate to show the requisite environmental violation or the connection between any complaint and subsequent retaliation. No reference is made to a specific statute or regulation which would constitute the alleged environmental violation. All the proof indicates that his complaint was of a monetary nature, seeking compensation for damage to his laboratory equipment without concern for environmental impact. Finally, a report made within the reach of this statute does not serve as life-long immunity from negative employment action. In any event, there is no evidence to suggest that Bernofsky's termination was in any way connected to his complaint about flooding rather than his inability to meet his salary needs with extramural monies. This Court is unwilling and unable to be the first to stretch this statute to include a cause of action based on these undisputed facts.

### La. Civ.Code art. 2315.3

█ Finally, Bernofsky has alleged a violation of now-repealed Article 2315.3 in the pre-trial order apparently based on the 1992 flooding incident in his laboratory at Tulane. That article provides in pertinent part as follows:

> In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.

This article does not relieve the plaintiff of proving the basic factual elements of a tort case; it imposes a more onerous proof requirement. *Billiot v. B.P. Oil Co.*, 645 So.2d 604 (La.1994). In order to prove entitlement to punitive damages under Article 2315.3, the plaintiff must prove: (1) the defendant's conduct was wanton or reckless; (2) the danger created by the defendant's wanton or reckless conduct threatened or endangered the public safety; (3) the defendant's wanton or reckless conduct occurred in the storage, handling or transportation of hazardous or toxic substances; and (4) the plaintiff's injury was caused by the defendant's wanton or reckless conduct. *Id.*

█ Any claim under this article fails for several reasons. First, the plaintiff offers nothing in response to Tulane's argument that any claim has prescribed under the one-year prescriptive period set forth in La. Civ. Code art. 3492. Even assuming that this claim has not prescribed, however, the plaintiff has not presented proof: (1) that any substance associated with the flood was hazardous or toxic; (2) that Tulane "engaged in" the storage, handling or transportation of hazardous or toxic substances; (3) that plaintiff was injured as a result of Tulane's allegedly mishandling of any allegedly hazardous or toxic substance; (4) that Tulane acted wantonly or recklessly; or (5) that Tulane's alleged misconduct threatened the public safety. *See: Strauch v. Gates Rubber Co.*, 879 F.2d 1282 (5th Cir.1989), *cert. denied,* 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990); *Anderson v. T & D Machine Handling, Inc.*, 1996 WL 518138 (E.D.La.1996).

Bernofsky, who began this litigation alleging that he was wrongfully terminated based on his status as an older Jewish professor, finishes with a claim that alleges that he was terminated as a result of reporting a flood in his laboratory in 1992. Again, all undisputed facts support the simple explanation that Bernofsky was terminated for his inability to meet his salary needs as required of a Research Professor in the School of Medicine.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment be and hereby is GRANTED. Judgment shall be entered in favor of defendant and against the plaintiff, dismissing all of the plaintiff's claims with prejudice.